OPINION OF THE COURT
Gabrielli, J.
Defendant, Jean Harris, was convicted, following a jury trial, of murder in the second degree and criminal possession of a weapon in the second and third degrees. This appeal presents for our consideration several purported errors occurring during the course of that trial, which defendant urges mandate reversal of the judgment of conviction. Inasmuch as our resolution of these issues leads us *340 to the conclusion that reversible error was not committed, there should be an affirmance.
Defendant’s trial for murder arose out of the shooting death of Dr. Herman Tarnower in his home on March 10, 1980. The People’s case proceeded on the theory that Mrs. Harris, who had been Dr. Tarnower’s paramour and companion for nearly 14 years, went to his home on the evening of the shooting and, acting out of jealous rage over the doctor’s relationship with a younger woman, deliberately shot and killed him. One of the prosecution’s witnesses, Dr. Tarnower’s house manager, testified to the difficulties that had resulted from the doctor’s relationships with the two women. Mrs. Harris’s oral statements, testified to by the police officers who were investigating the shooting, were also relied upon as evidence of her motivation in going to the Tarnower estate on the evening of the shooting. The prosecution also utilized the so-called “Scarsdale letter”, written by Mrs. Harris to the doctor over the weekend prior to his death, as strong evidence of Mrs. Harris’s state of mind. In this letter, which contained several unflattering references to the younger woman in Dr. Tarnower’s life, Mrs. Harris described her feelings of anguish and rejection over the doctor’s apparent preference for this younger woman.
The defense theory was that Mrs. Harris, physically agitated by the lack of medication she had been taking for some time and suffering from recent failures and disappointments in her professional life, had determined that she wanted to end her life. Intending to see Dr. Tarnower once more before she died, Mrs. Harris drove to his home on March 10, hoping only to speak with him for a few moments. She entered the doctor’s home and went into his bedroom, where she found him sleeping. Mrs. Harris was unable to rouse the doctor in order to have a conversation with him. Apparently upset by his lack of responsiveness and the presence of the belongings of the other woman in the bathroom, Mrs. Harris decided to kill herself there in the doctor’s bedroom. According to Mrs. Harris, as she attempted to carry out her desire, the doctor, who had by now awakened, tried to prevent her from shooting herself. Several struggles ensued, during which Mrs. Harris’s gun *341 discharged, shooting Dr. Tarnower and inflicting four gunshot wounds from which he died. Evidence concerning Mrs. Harris’s version of these events and her state of mind on the night of the shooting and previously thereto was presented largely through the testimony of Mrs. Harris herself. The defense also relied upon a will and certain letters, written by Mrs. Harris just prior to her departure for the Tarnower - estate on March 10, to demonstrate her belief that she would never return to her home, because she intended to end her life. In addition, the defense offered a number of witnesses who testified that Mrs. Harris had indeed been distraught over recent events occurring in connection with her position as headmistress of the Madeira School.
Thus, the major and, indeed, critical issue at trial was whether, as the prosecution contended, defendant had deliberately shot Dr. Tarnower, intending to kill him, or, as the defense urged, the shooting had been accidental. This question was resolved by the jury in favor of the prosecution, and the legal sufficiency of the evidence upon which the verdict was based is not challenged on this appeal. Defendant claims, however, that numerous errors infected both pretrial proceedings and the trial itself, which operated to deprive her of a fair trial. We deal with these contentions separately below and engage in further discussion of the evidence in this case only insofar as it relates to the specific issues raised by defendant.
I
On the night of her arrest at the Tarnower residence, defendant made a statement over the telephone to her attorney. She contends that the introduction into evidence of that statement, testified to by a police officer who overheard it, violated her right to counsel under the Constitution of this State. It appears that Mrs. Harris, having been read her Miranda rights several times, having waived those rights and made statements to the police officers who were investigating the shooting, was thereafter asked if she would like to make a telephone call. Mrs. Harris responded that she would like to call a lawyer friend. After an attempt to make this call at a nearby telephone was unsuccessful, one of the officers, Lieutenant Flick, went into the house manager’s bedroom to place the *342 call for Mrs. Harris. When the lieutenant reached Mrs. Harris’s party, he left the bedroom to so inform her. Officer Tamilio, at Lieutenant Flick’s request, assisted Mrs. Harris to the bedroom. When they entered the room, the house manager’s husband was already there, standing a few feet from the telephone. Immediately upon picking up the telephone, Mrs. Harris made the statement: “Oh, my God, I think I’ve killed Hy”. Its admission into evidence is now challenged.
It is clear that, at the time Mrs. Harris made this statement, her right to counsel had attached by virtue of her request to speak with an attorney (People v Cunningham, 49 NY2d 203). Once the right to counsel had been invoked, no further questioning of Mrs. Harris would have been permissible, unless she had affirmatively waived her rights in the presence of her attorney (People v Rogers, 48 NY2d 167; People v Hobson, 39 NY2d 479). Notwithstanding this rule, statements made by a defendant who has invoked the right to counsel may nevertheless be admissible at trial if they were made spontaneously. In order for such statements to be characterized as spontaneous, it must “be shown that they were in no way the product of an ‘interrogation environment’, the result of ‘express questioning or its functional equivalent’ ” (People v Stoesser, 53 NY2d 648, 650).
On the record before us, it is clear that no questioning of Mrs. Harris occurred after she invoked her right to counsel. The statement was neither induced, provoked nor encouraged by the actions of the police officers (see People v Rivers, 56 NY2d 476), who had been entirely solicitous of Mrs. Harris’s request to speak with a lawyer and had scrupulously honored her rights in this regard (cf. People v Grimaldi, 52 NY2d 611). There is nothing in the record to indicate that Officer Tamilio endeavored, by subtle maneuvering or otherwise, to overhear Mrs. Harris’s conversation with her attorney. Indeed, the record reflects that this officer, having assisted Mrs. Harris to the telephone, was backing out of the room when he inadvertently overheard the statement. It appears, therefore, that the officer had no opportunity to remove himself from earshot before Mrs. Harris made the damaging statement. Thus, we are *343 not presented with a situation in which the police have failed to respect a defendant’s right to consult privately with an attorney. Under the circumstances of this case, we conclude that no violation of defendant’s right to counsel occurred.
Although we hold today that a statement properly characterized as spontaneous is no less so simply because it was made to an attorney, a further aspect of the admissibility of such statements should be considered. Given that the communication received in evidence was made to an attorney, the attorney-client privilege is implicated, in addition to the right to counsel. This privilege protects those communications made by a defendant to an attorney that are intended to be confidential (People v Buchanan, 145 NY 1; Baumann v Steingester, 213 NY 328). It cannot be said, on the facts of this case, that Mrs. Harris, in speaking over the telephone to a lawyer in the known presence of both a police officer and the house manager’s husband, intended this communication to be confidential.[1] Generally, communications made in the presence of third parties, whose presence is known to the defendant, are not privileged from disclosure (see Richardson, Evidence [10th ed], § 413; 8 Wigmore, Evidence [McNaughton rev], § 2311). We see no reason to depart from this general rule simply because one of those parties present was a police officer, who, as has been noted, did nothing to purposely overhear the conversation or conceal his presence from defendant.[2] Thus, we conclude that defendant’s attorney-client privilege was not violated by the officer’s testimony regarding this communication and that the testimony was properly admitted by the trial court.
II
The next issue to be considered is whether defendant was denied a fair trial by the prosecution’s use of certain *344 evidence in rebuttal. On direct examination, Mrs. Harris testified that, on the morning of March 10, she called Dr. Tarnower at his office in the Scarsdale Medical Center from her private telephone. Mrs. Harris stated that she and the doctor spoke of a number of things, and the doctor invited her to spend an upcoming weekend with him. On cross-examination, Mrs. Harris strenuously denied that, during the conversation, the doctor told her that she had lied and cheated, that she was going to inherit $240,000 or that he wanted her to stop bothering him. The prosecution then offered in rebuttal the testimony of a patient of Dr. Tarnower’s who had been in an examining room with the doctor on the morning of March 10, when a telephone call was put through. The doctor answered the telephone in the examining room, but left the room to complete the conversation without severing the connection to the examining room. The patient overheard parts of the ensuing conversation, and although the voices were muffled and indistinct, she heard the doctor make the following statements: “God damn it, Jean, I want you to stop bothering me”; “You’ve lied and you’ve cheated”; “Well, you’re going to inherit $240,000”. We agree with the Appellate Division that this evidence was proper rebuttal.
The prosecution, of course, had the burden of establishing that Mrs. Harris intended to kill Dr. Tarnower. To this end, evidence was introduced in an attempt to establish that Mrs. Harris was in a jealous rage over the doctor’s relationship with another woman. Mrs. Harris sought to controvert this theory of her state of mind by offering evidence that she acted solely out of her desire to end her own life and not out of any intent to harm the doctor, whose need for other women she had come to understand and accept. Mrs. Harris’s direct testimony regarding the telephone conversation she had with the doctor on the morning of the shooting tended to confirm her view that all was well in their relationship.
It was proper, thereafter, for the prosecution to attempt to rebut Mrs. Harris’s version of the nature of that relationship by introducing evidence concerning statements made *345 by the doctor during the telephone call, which had been denied by Mrs. Harris. The rules concerning the proper scope of rebuttal evidence are clear. The party holding the affirmative of an issue must present all evidence concerning it before he closes his case. Thereafter, that party may introduce evidence in rebuttal only.[3] “Rebutting evidence in such cases means, not merely evidence which contradicts the witnesses on the opposite side and corroborates those of the party who began, but evidence in denial of some affirmative fact which the answering party has endeavored to prove” (Marshall v Davies, 78 NY 414, 420; see People v Bonier, 189 NY 108, 121). In the present case, the prosecution offered the testimony of Dr. Tarnower’s patient not to establish an element of its case-in-chief (i.e., intent to kill), but merely to contradict Mrs. Harris’s testimony and to disprove the alternate state of mind offered to explain her actions. That being the case, the evidence was properly received in rebuttal even if it could have been offered on direct (Ankersmit v Tuch, 114 NY 51; see 6 Wigmore, Evidence [Chadbourn rev], § 1873, pp 678-679). As we said in Ankersmit (114 NY, at p 55): “It is doubtless true that the evidence was competent and could have been introduced by the plaintiffs as a part of their affirmative case for the purpose of showing an intent to cheat and defraud, and that their neglect to introduce it at that time deprives them of the right to make use of it as affirmative evidence. But a party has the right to impeach or discredit the testimony of an opponent, and such evidence is always competent. He may contradict the testimony of a witness as to any matters upon which he has been called to give evidence in chief, provided it is not collateral to the issue”.
In any event, even if the evidence were not technically of a rebuttal nature, we believe that the trial court, in allowing its introduction, properly exercised the discretion afforded by CPL 260.30 (subd 7). This statute provides that the court may permit either party, in the interest of justice, to offer evidence which was more properly a part of the direct case. Defense counsel and the prosecutor engaged in *346 extensive discussion with the Trial Judge concerning the admissibility of the patient’s testimony on the People’s direct case. Although the prosecution had some evidence in its possession indicating that the person making the telephone call overheard by the patient was Mrs. Harris, it nevertheless believed that it could not lay a proper foundation for the receipt of this testimony in evidence, particularly given the fact that the patient had never heard Mrs. Harris’s voice before and thus could not identify it (cf. People v Lynes, 49 NY2d 286). Once Mrs. Harris testified that she had indeed made this call, however, the previous authentication problem was obviated. Considering the difficulties faced by the offer of such proof on the People’s direct case and the subsequent testimony of Mrs. Harris which provided the appropriate foundation for the People’s proof, we believe that the trial court could properly exercise its discretion to allow the People to introduce such evidence as rebuttal.
Ill
On the eve of pretrial hearings, defendant requested, by oral motion, that the press be excluded from attendance at preliminary hearings. There is no doubt that substantial publicity surrounded the developments in this case concerning Dr. Tarnower’s death and defendant’s impending prosecution. Nevertheless, The trial court refused to close the pretrial proceedings, finding that the statements which were the subject matter of the suppression hearing had been known to the public for months and that defense counsel himself had been listed as the source of some of the commentary on the case. The court, considering both the defendant’s right to a fair trial and the right of the press and the public to attend criminal proceedings, concluded that it had not been shown that closure of the suppression hearings was necessary to ensure that an impartial jury would be impaneled.
Matter of Gannett Co. v De Pasquale (43 NY2d 370, affd 443 US 368) is the first in a recent line of cases dealing with the right of access by the press and public to criminal proceedings. In Gannett, this court held that where press commentary on pretrial suppression hearings would threaten the impaneling of an impartial jury, by making *347 available to the public the details of evidence sought to be suppressed as tainted by illegality, such hearings are presumptively to be closed to the public (43 NY2d, at p 380). Although the United States Supreme Court’s affirmance in Gannett was based upon its view that the Sixth Amendment guarantee of a public trial is personal to the accused and does not afford the press and public a separate right of access to pretrial proceedings (443 US, at pp 387-391),[4] this court subsequently indicated that the concept of a public trial is not so narrowly viewed in this State (Matter of Westchester Rockland Newspapers v Leggett, 48 NY2d 430, 437). In addition to discussing the factors which must be considered in determining whether the public right to attend pretrial proceedings outweighs the defendant’s right to a fair trial free of the potentially prejudicial impact of publicity concerning evidence subject to possible suppression, these cases laid down the procedural framework within which the possibility of closure of pretrial proceedings must be assessed.
It must be emphasized, however, that in these cases, we dealt with demands by the press to gain access to pretrial proceedings. The issue of whether such access could be denied was decided in the context of a closure order granted on the request of defendant, without opposition by the prosecution. In contrast, the present case involves the denial of a motion to close the pretrial proceedings, which had been opposed by the prosecutor as well as the press. Thus, the posture of this case differs in an important respect from that in Gannett and Westchester Rockland Newspapers, for here it is not the press asserting that a *348 pretrial hearing should not have been closed; rather, it is the defendant who argues that the failure to close the pretrial hearing resulted in the denial of a fair trial.
Where this latter claim is asserted, it is not sufficient to demonstrate that a closure order may have been warranted and would have withstood an attack by the press. The grant of a closure order is premised upon the belief that defendant might be denied a fair trial by the impact on potential veniremen of widespread publicity concerning evidence whose legality and admissibility at trial have been challenged. In such a case, the right of the press and public to attend the proceeding is deemed outweighed by the defendant’s right to a fair trial. However, where the court has refused to close the pretrial hearings, even though closure may have been proper, and the substance of challenged evidence is publicized to defendant’s claimed prejudice, the focus of the inquiry changes. Under these circumstances, we are concerned, not with balancing the conflicting rights of the press and the defendant, but with the question of whether defendant has in fact been denied a fair trial. Accordingly, to make out such a fair trial claim, it is incumbent upon the defendant to demonstrate more than the potential for prejudice that is sufficient to justify closure; rather, it must appear that prejudice to the defendant actually resulted from the failure to close the proceeding.
In the present case, it is clear that no such prejudice has been demonstrated. As the hearing Judge noted, the details of the statements which were the subject of the suppression hearing were already known to the public. Closure of the hearing would have accomplished little in terms of attempting to shield potential veniremen from press commentary on this evidence. Moreover, it is certainly relevant at this juncture to note that the statements were not suppressed as a result of the hearing. The difficult problem that occurs when suppressed evidence is nevertheless made available to the public through the press was thus not presented in this case, because the challenged statements were deemed admissible at trial. Inasmuch as *349 the record in this case contains no indication that defendant was in fact prejudiced by denial of her closure motion, there is no basis upon which to conclude that defendant was denied a fair trial with regard to this issue.
IV
Defendant argues that she was denied a fair trial before an impartial jury when the trial court refused to allow defense counsel to exercise a peremptory challenge to a sworn juror, or, in the alternative, to excuse that juror for cause, on the basis of information acquired after the juror was sworn. Upon the initial examination, this juror revealed that her daughter had been arrested about a year earlier in Westchester County, but that she did not know the eventual disposition of the case. The juror thought that the Grand Jury had not returned an indictment against her daughter because there was insufficient evidence. The juror was accepted by both sides and sworn. Several days later, an Assistant District Attorney who was involved in the prosecution discovered that he had handled the case referred to by the juror and that he had been instrumental in having the indictment against the juror’s daughter dismissed in the interest of justice. When the assistant prosecutor disclosed this information to the trial court, defense counsel asked that the juror be excused for cause, or that he be allowed to exercise a peremptory challenge. The trial court denied both requests.
The exercise of peremptory challenges is governed by CPL 270.15. Pursuant to this statute, after each side has been given an opportunity to challenge a juror for cause, the court must permit peremptory challenges, with the People being required to exercise such challenges before the defendant. Subdivision 4 of this statute specifically states the circumstances under which a juror, once sworn, may be challenged for cause. Where a challenge for cause is made upon a ground not known to the challenging party before the juror was sworn, the court may allow the challenge prior to the time that the first witness is sworn at the trial. This express provision for the exercise of a challenge for cause after a juror is sworn must be taken as a legislative direction that any other type of challenge to a sworn juror is impermissible (see People v Hughes, 137 NY 29; *350 People v Carpenter, 102 NY 238; People v Chmarzewski, 51 AD2d 554; People v Mancuso, 26 AD2d 292, mod 22 NY2d 679).[5] This interpretation of the statute is entirely consistent with the perceived need to place appropriate limitations on one of the most time-consuming aspects of criminal jury trials (Bellacosa, Supplementary Practice Commentary, McKinney’s Cons Laws of NY, Book 11 A, CPL 270.15,1972-1981 Supplementary Pamphlet, p 413), while still allowing challenges to sworn jurors where good cause to excuse the juror is demonstrated.
It was nevertheless within the trial court’s power, as noted, to entertain the request that the sworn juror be excused for cause. The defense relied upon CPL 270.20 (subd 1, par [c]) as the ground for its challenge. This objection to a juror is based upon, inter alia, the existence of such a relationship between the juror and counsel for the People as is likely to preclude the juror from rendering an impartial verdict. Here, defense counsel knew that the juror’s daughter had been arrested in Westchester County and that although she did not know the precise disposition of the case, she knew that the result was favorable to her daughter. With this knowledge, defense counsel accepted the juror. The information acquired after the juror was sworn, which is all that may be considered in determining defendant’s challenge for cause (see CPL 270.15, subd 4), was that an Assistant District Attorney involved in the present case had handled the case against the juror’s daughter and had himself sought dismissal of the indictment therein. There is no indication in the record that the juror knew this Assistant District Attorney or that he knew the juror. In addition, it does not appear that the juror knew that anyone associated with the District Attorney’s office, least of all this particular trial assistant, had been responsible for the dismissal of the indictment. Nor *351 did defense counsel seek an opportunity to further explore these possibilities.
On this record, it was not error to deny the challenge for cause. Defendant has not demonstrated the existence of such a relationship between the juror and the Assistant District Attorney as rendered the juror unsuitable for service (see, e.g., People v Provenzano, 50 NY2d 420).
We have examined defendant’s remaining allegations of error concerning prosecutorial misconduct, error in the court’s charge and refusal of a discovery request. Those of defendant’s objections which are preserved for our review are lacking in merit. Accordingly, defendant’s conviction should be affirmed.

. Thus, this case does not present a situation in which it is claimed that defendant, through actions occurring subsequent to the confidential communication, has waived the attorney-client privilege (People v Lynch, 23 NY2d 262, 271). Rather, in this case, defendant’s choice to speak to an attorney in the presence of third parties effectively prevented the privilege from attaching.

. We recognize that the questions of whether defendant’s right to counsel or attorney-client privilege have been violated may involve very similar factual inquiries, because the actions and purpose of the police are relevant to both questions.

. Under some circumstances, the trial court has discretion to allow subsequent evidence which is not strictly rebuttal evidence. This point is discussed infra.

. The Supreme Court found it unnecessary to determine whether such a right of access to pretrial proceedings is guaranteed the press and public by virtue of the First Amendment. The court held that, assuming such a right to exist, it was given appropriate deference by the trial court in that case (Gannett Co. v De Pasquale, supra, at pp 392-393), inasmuch as the closure decision was based “ ‘on an assessment of the competing societal interests involved’ ” (id., at p 393). In other words, any right of access on the part of the press was outweighed by the defendants’ right to a fair trial.
The Supreme Court has since determined that the right of the public to attend criminal trials is implicit in the guarantees of the First Amendment (Richmond Newspapers v Virginia, 448 US 555; see, also, Globe Newspaper Co. v Superior Ct. for County of Norfolk, 457 US_, 102 S Ct 2613), but it has not yet reached the question of whether that right extends also to pretrial proceedings (see Richmond Newspapers v Virginia, supra, at p 599 [Stewart, J., concurring]).

. To the extent that People v West (38 AD2d 548, affd no opn 32 NY2d 944) might suggest a contrary result, it is overruled. Although the trial court in West appears to have allowed a peremptory challenge to a sworn juror, we note that it was argued on appeal that the juror should have been excused for cause. Our affirmance without opinion should not be interpreted as an adoption of the lower courts’ reasoning (see Rogers v Decker, 131 NY 490, 493; Matter of Sentry Ins. Co. [Amsel], 36 NY2d 291, 295).