■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v AMALIO HERNANDEZ, Also Known as AMILIO HERNANDEZ, Also Known as EMILIO HERNANDEZ, Appellant.—Judgment, Supreme Court, New York County, rendered January 4, 1985, (Frank J. Blangiardo, J.), convicting defendant of the crimes of criminal sale of a controlled substance in the third degree (Penal Law § 220.39), criminal possession of a controlled substance in the third degre (Penal Law § 220.16), and criminal possession of a controlled substance in the seventh degree (Penal Law § 220.03), is modified, on the law, to the extent of reversing the first two convictions of criminal sale and possession with intent to sell, and directing a new trial as to those counts, and as so modified, the judgment is otherwise affirmed.

In our view, the trial court committed error in permitting excessive cross-examination of defendant as to damaging collateral matter and then allowing the People, on rebuttal, to adduce prejudicial testimony which exceeded appropriate limits.

At trial, the People's evidence showed that on June 21, 1984, a four-man police team, consisting of Sergeant Michael Barron and Officers James Orlando, Frank Bose and Michael Bisogna, was engaged in undercover narcotics surveillance on the Lower East Side of Manhattan. In the late afternoon, Officers Orlando and Bose were manning an observation post on the roof of 42 Clinton Street, a five- or six-story building. Sergeant Barron remained below with Officer Bisogna in a police taxicab equipped to maintain two-way radio contact with the rooftop observers. At about 4:00 P.M., Orlando spotted defendant (known to him as "Gimpie") through his 7 × 50-power binoculars and saw him engage in two suspicious transactions which were followed up by the taxicab team but resulted in no arrest. Then, at about 5:30 P.M., Orlando observed a male Hispanic, later identified as Edwin Rosario, approach defendant and appear to hand defendant cash in exchange for a glassine envelope. In response to Orlando's radio alert with a description of the buyer, the taxicab team

arrested Rosario within seconds. Officer Bisogna searched Rosario and recovered one glassine envelope marked "Force 44" from Rosario's right shoe as well as 37 hypodermic instruments. Thereupon, the rooftop team descended from the roof, arrested defendant, and found 21 blue-tinted/glassine envelopes stamped with the logo "Force 44" in defendant's shoe. Both the glassine envelope taken from Rosario and the 21 envelopes recovered from defendant were analyzed and found to contain cocaine.

After the People rested, defendant took the stand and testified that as an unemployed pauper since 1982 he had become addicted to cocaine. To support his habit he became a professional shoplifter who stole clothing from department stores and then sold his loot on the streets. In 1980 and 1982 he had been convicted of grand and petit larceny. In addition to other arrests and convictions, he had been arrested by Officer Bisogna on May 1, 1984, and had pleaded guilty to criminal possession of a controlled substance. On June 21, 1984, the day in question here, he had purchased drugs from a seller on the corner of Ridge and Stanton Streets at about 4:30 P.M., paying $105 for 21 $5 (nickel) glassines of cocaine, these funds coming from his sale of six pairs of jeans and five shirts all stolen and then sold in the same area. He put these "nickel bags" in his sneakers for his own consumption; he was not planning to sell them to anyone else and had never sold drugs to anyone. On cross-examination, over defense objection, defendant was pressed with the details of three recent episodes in which he allegedly sold drugs on May 1, May 12, and May 15, 1984. Defendant denied any involvement with drug selling on these occasions.

Thus the stage was set for the People's rebuttal case which proceeded over vigorous defense objection. Recalled to the stand, Officer Bisogna testified that on May 1, 1984, he was walking down Rivington Street when he saw defendant holding glassine envelopes in his hand surrounded by a crowd. When defendant sighted the officer, he threw the glassine envelopes to the ground. (This episode resulted in defendant's arrest and conviction, by way of plea to criminal possession of a controlled substance.) From Officer Orlando, as well as Officer Bisogna, the jury learned that on May 12, 1984 at 6:00 P.M., these officers disguised in clerical garb, watched from the rectory of a neighborhood church as defendant appeared some 15 feet away holding a clear glassine bag containing about 50 glassine envelopes. Customers lined up in front of defendant exchanging money for glassine envelopes. Standard police

procedure was to arrest buyers first, and these officers arrested a buyer who possessed glassine envelopes but Hernandez escaped. On May 15, 1984, Officer Orlando, together with an officer new to the jury, Dorian Irizarry, was manning an observation post with Officer Bisogna and Sergeant Barron on duty below. The observing officers saw defendant make three sales of contraband. A buyer was arrested with glassine envelopes as was Hernandez who was found in possession of three glassine envelopes containing cocaine.

To permit this massive rebuttal with its evidence of multiple narcotics sales by defendant on three other occasions was highly prejudicial to defendant and constituted error. It is true that "[r]ebutting evidence * * * means, not merely evidence which contradicts the witnesses on the opposite side and corroborates those of the party who began, but evidence in denial of some affirmative fact which the answering party has endeavored to prove." *(Marshall v Davies,* 78 NY 414, 420; *see, People v Harris,* 57 NY2d 335, 345.) Here the rationale permitting rebuttal adopted by the trial court was that defendant had opened the door to such proof by his assertion that he never sold narcotics. But, in reversing a conviction for the sale of narcotics in *People v Crandall* (67 NY2d 111, 114), the Court of Appeals held: "Nor does a defendant 'open the door' to admission of other crime evidence in rebuttal by his testimony that he made no sale of narcotics, that he knew the person to whom he is alleged to have made the sale for which he is on trial to be an undercover officer and had assisted him until asked to engage in an illegal act, after which the officer and several of his colleagues threatened him with arrest, such rebuttal testimony being relevant only to defendant's criminal character and not to any element of the crime charged or in refutation of any affirmative fact proved by defendant."

The *Crandall* court also observed (at p 117): "It was also error to allow cross-examination and rebuttal testimony concerning the seven other transactions listed above. Here, as in *People v Rahming* (26 NY2d 411), defendant confined his direct testimony to a denial that he had sold any drugs to the undercover officer and his version of his relationship with the officer. Nothing in that testimony involved the seven sales concerning which defendant was cross-examined. 'Thus, it was error for the prosecutor on cross-examination to have ranged beyond the defendant's direct examination "in order to lay a foundation for the tainted evidence on rebuttal" ' *(People v Rahming,* 26 NY2d, at p 418, *supra,* quoting *People v Miles,* 23 NY2d 527, 543). Nor can cross-examination to the extent

permitted be justified as impeachment by evidence of specific acts tending to impair credibility."

In our view, *Crandall (supra)* cannot be distinguished from the case at bar by the circumstance that the defendant witness' denial there related only to sales made with the undercover officer directly involved in the prosecution instead of, as here, sales made to total strangers to the action. If anything, the basis for preclusion would appear stronger in the latter instance. In *Crandall*, the defendant's affirmative assertion was not merely exculpatory—he went considerably further and attacked the character of the police witnesses by asserting that they were framing him in retaliation for his refusal to commit criminal acts on their behalf. Yet even this was insufficient to "open the door" to the kind of rebuttal which was permitted here.

In any event, as we found in *People v Andujar* (61 AD2d 755), "the over-all result" of this rebuttal evidence regarding multiple sales wholly unconnected to the single transaction charged "was to deprive the defendant of a fair trial." In this case defendant, prepared to meet the charge of a single drug sale, was abruptly obliged to address three more uncharged sales in the closing stages of the trial. In the face of this rebuttal proof defendant was placed at a severe disadvantage. Since the three crimes testified to on rebuttal had never been presented to a Grand Jury, there was, of course, no testimony before that body available for impeachment purposes. *(People v Rosario,* 9 NY2d 286.) This disability was inadequately evaluated by the Trial Judge before permitting such extensive rebuttal. Nor did defendant have adequate time to prepare a "defense" to these new "charges". Indeed, defendant's motion for a continuance to seek the testimony of Susan Sergeant, a "customer" in one of the three additional sales, was summarily denied, leaving open the possibility that defendant's constitutional right to call witnesses in his defense was abridged.

It should be noted that this rebuttal testimony cannot be justified on the theory that it was appropriate to show defendant's intent to sell or to negative any claim of accident or mistake *(cf. People v Molineux,* 168 NY 264). For such a purpose, the evidence would have to be tendered as part of the People's case-in-chief. Here, on the contrary, this evidence was received in rebuttal by the court solely to affect defendant's credibility, and the jury was so instructed. This was tantamount to a showing that defendant had a criminal propensity. It may also be noted that the People had adequate *Molineux*

proof from the two prior transactions that Officer Orlando observed from the roof prior to defendant's arrest.

Despite the foregoing, there is no need to reverse defendant's conviction for simple possession of narcotics (criminal possession of a controlled substance in the seventh degree), since guilt of this charge was virtually admitted by defendant as a fundamental part of his defense strategy.

Accordingly, defendant's convictions for criminal sale and possession with intent to sell must be reversed, but his conviction for criminal possession of a controlled substance in the seventh degree is affirmed. Concur—Fein, Milonas and Wallach, JJ.

Sandler and Sullivan, JJ., dissent in a memorandum by Sullivan, J., as follows: On June 21, 1984, undercover police officers observed defendant selling drugs in a playground behind a school on the Lower East Side of Manhattan. After the third sale, defendant and a buyer, Edwin Rosario, were arrested. One glassine envelope containing the marking "Force 44" was recovered from Rosario, and 21 glassine envelopes with the same logo from Hernandez. All the glassine envelopes contained cocaine.

After a jury trial, defendant was convicted of criminal sale of a controlled substance in the third degree, and one count each of criminal possession of a controlled substance in the third and seventh degrees, the only charges submitted. On appeal, he argues, *inter alia,* that the trial court erroneously permitted the People to cross-examine him and to offer rebuttal evidence regarding uncharged drug sales which allegedly occurred on earlier dates.

The People's case was comprised of testimony from several police officers who were members of an undercover surveillance team, including Officer Orlando, who, with the aid of a 7 × 50-power binoculars, observed three drug transactions between defendant and third parties. The last of these transactions was with codefendant Rosario, who, in exchange for money, received a glassine envelope from defendant. Officer Orlando radioed a description of Rosario to his backup team, who arrested him within seconds. Defendant was arrested shortly thereafter. The 21 glassine envelopes stamped with the logo "Force 44", the same as that which was embossed on the glassine envelope recovered from Rosario, were found in defendant's shoe.

Defendant took the stand in his own defense. Now 29 years of age, he had not held a job since 1982, owned nothing of

value, and had been addicted to cocaine for 10 years. He supported his drug habit by stealing clothing from department stores and selling it on the streets of the Lower East Side. In response to his lawyer's questioning, he testified that he had been arrested in 1980 and 1982 for such thefts, and had pleaded guilty to grand and petit larceny. He had a number of other petit larceny and attempted petit larceny convictions as well. In addition, defendant had been arrested in October 1982 for possession of a hypodermic needle, and, on May 1, 1984, he was arrested by Officer Bisogna, one of the arresting officers, here, and pleaded guilty to criminal possession of a controlled substance.

Defendant admitted that on June 21, 1984, at around 4:00 P.M., he was in the playground, his usual daytime haunt. Earlier that day, he had stolen six pairs of jeans and five shirts and had sold them for $105, which he used to buy 21 glassine envelopes of cocaine. He had put the envelopes in his sneaker, intending to use them, not to sell them. He estimated that it would take only an hour to use all 21 envelopes; in fact, he had been using 25 to 35 glassine envelopes of cocaine a day for the six-month period prior to his arrest. He was an addict, not a drug seller. He had never sold drugs to anyone.

In light of defendant's assertion that he had never sold drugs, the People were permitted to cross-examine him, over objection, about earlier incidents in which he had allegedly sold drugs. In response to the prosecutor's questioning, he denied that he had sold drugs on May 12, 1984 in front of Our Lady of Sorrows Church to a Joseph Morales or anyone else, or that he had sold drugs on May 15, 1984 to a woman named Susan Sergeant. He had never met Rosario before his arrest in the playground. Nor had he spoken to a black man or a pregnant white woman that day.

In rebuttal, the People recalled Officer Bisogna, who testified that on May 1, 1984, he was walking down Rivington Street and saw a crowd of people around defendant, who held glassine envelopes in his hand. When defendeant saw Bisogna, he threw the envelopes to the ground. Officers Orlando and Bisogna both testified that on May 12, 1984, at 6:00 P.M., they were in clerical garb, and watched from the inside of a second-story window of the rectory of Our Lady of Sorrows Church as defendant, 15 feet away, held a clear plastic bag containing 50 or 60 glassine envelopes. Lined up in front of him was a crowd of people, three or four of whom exchanged money for glassine envelopes. In such "observation post" situations, it was customary to arrest the buyers first. The officers did arrest one

Morales, from whom glassine envelopes were recovered, but they were unable to find defendant.

Officers Orlando, Irizarry and Bisogna all testified to an incident that occurred on May 15, 1984. Officers Orlando and Irizarry had taken up an observation post near Rivington and Ridge Streets with Officer Bisogna and Sergeant Barron acting as their backup team. Through the use of binoculars, the officers saw people line up in front of defendant, and, in three or four instances, observed an exchange of money for glassine envelopes. One buyer, subsequently identified as Susan Sergeant, was arrested in possession of two glassine envelopes. Defendant was also arrested this time and three glassine envelopes were recovered from a slit inside his pants near the zipper.

Defendant argues that the prosecutor's cross-examination and the officers' rebuttal testimony concerning his prior drug sales were irrelevant to the issues at trial and were designed solely to demonstrate his criminal propensity. We are not so persuaded. Once defendant, as part of his case, attempted to establish the affirmative fact that he never sold drugs to anyone, he made his prior drug sales activity a relevant focus of inquiry.

In his testimony defendant did not dispute that he was in possession of 21 glassine envelopes of cocaine at the time of his arrest. Possession of so many glassine envelopes, if unexplained, would, of course, support an inference that he was in the business of selling drugs. To rebut that inference, defendant testified, on his direct examination, that he was a drug addict and carried such a large quantity of drugs only for personal use. Defendant also willingly admitted his prior convictions of petit larceny and possession of a controlled substance, obviously trying to portray himself as merely an addict who supported his habit with petty thefts. Not content just to deny that he had sold drugs on June 21, 1984, however, defendant testified that he, in fact, had never sold drugs.

Before cross-examination, the prosecutor informed the court that he intended to question defendant about three prior occasions when he had been observed selling drugs, and to offer extrinsic evidence to rebut defendant's testimony that he had never sold drugs. Defendant argued that allowing the prosecutor such latitude would contravene the court's earlier *Sandoval* ruling prohibiting the prosecutor from inquiring into the underlying facts of any crime. Defendant argued further that the prosecutor's tactics would also violate the

rule prohibiting the introduction of extrinsic evidence on collateral matters.

The court ruled that the prosecutor was entitled to present evidence to refute defendant's testimony that he had never sold drugs. Thus, the prosecutor was permitted to cross-examine defendant about the true extent of his record as a petty thief, and elicited from him that he had been arrested only twice in the past four years. As already noted, the prosecutor also questioned defendant about the underlying facts of his May 1, 1984 arrest, which had led to his conviction for criminal possession of drugs, and about the events of two other days in May 1984, when police officers had seen him selling drugs. In addition, four officers, three of whom had been witnesses on the People's direct case, testified on rebuttal that they had either seen defendant selling drugs or had observed him in circumstances from which such an inference could be drawn.

Clearly, a defendant who chooses to assert matters on direct examination which might otherwise be collateral may not preclude cross-examination designed to show his testimony to be false. The scope of cross-examination with respect to credibility is a matter committed to the sound discretion of the trial court, reviewable only for abuse and injustice. *(People v Duffy,* 36 NY2d 258, 262-263.) Neither is apparent here. Subject to special exceptions, though, extrinsic evidence is inadmissible, if introduced solely to impeach credibility on a collateral issue. *(People v Schwartzman,* 24 NY2d 241, 245; *People v Sorge,* 301 NY 198, 201; *see, Halloran v Virginia Chems.,* 41 NY2d 386, 390.) Defendant's testimony, volunteered on his direct examination, that he never sold drugs to anyone was hardly a collateral matter, however. While not conclusive on the issue of whether he sold drugs to Rosario in the schoolyard on June 21, 1984, as charged, it was nonetheless an integral part of a well-orchestrated depiction of an almost picaresque character.

An avowed drug addict and thief, defendant testified that he supported his drug habit by stealing regularly. In fact, he even exploited his criminal record in an effort to make the point. In a similar vein, he dismissed his possession of the 21 glassine envelopes of cocaine seized from him at the time of his arrest by testifying that his drug habit was such that he could dispose of their contents for his own use in an hour. When viewed in context, defendant's assertion that he had never sold drugs to anyone became a central element of his defense that he was a thief and drug user, but not a drug

dealer. Thus, as a result of defendant's strategy, testimony that might otherwise be collateral had become material. He "had 'opened the door' on the issue * * * and * * * could not benefit from his testimony on direct examination, yet bar its refutation on [the People's rebuttal] case". *(Halloran v Virginia Chems.,* 41 NY2d, at p 393, citing cases; *Walder v United States,* 347 US 62.)

*People v Crandall* (67 NY2d 111, 118), upon which the majority relies in great measure, acknowledged that evidence of other crimes may be used on rebuttal if introduced " ' "in denial of some affirmative fact which the answering party ha[d] endeavored to prove" ' " (citing *People v Harris,* 57 NY2d 335, 345, quoting *Marshall v Davies,* 78 NY 414, 420). Thus, neither the cross-examination not the rebuttal evidence constituted improper evidence of uncharged crimes. As matters turned out, the court mistakenly charged the jury, over the People's objection, to consider the rebuttal evidence only in evaluating defendant's credibility, thus, though undeservedly, limiting the damaging effects of the rebuttal case.

Finally, from our reading of the record, we do not find that the rebuttal testimony was so disproportionate to the over-all case that it deprived defendant of a fair trial by diverting the jury from focusing on the pivotal question, viz., whether he had, indeed, sold drugs at the time charged.*

---

* The majority also finds unfair the inability of defendant to use Grand Jury testimony regarding the uncharged crimes for impeachment purposes, since they were never presented to the Grand Jury. We are unaware of any requirement that a crime be submitted to a Grand Jury before the People may avail themselves of evidence of it for rebuttal or impeachment purposes. In any event, with regard to these crimes, defendant was not prejudiced in any manner, since the People did supply him with all of the *Rosario* material in their possession, including the officers' memorandum books, a UF 61 for the May 12th arrest, the District Attorney's papers for the May 1st and 15th arrests, a labaratory report for the May 1st arrest, the Assistant District Attorney's write-up of the May 1st case, and the arrest report and complaint for that day. Clearly, defendant's problem is not that he lacked sufficient *Rosario* material with which to refute the officers' rebuttal testimony, but that the court would not permit his testimony about his criminal *modus operandi* to go unchallenged.

The majority also cites the trial court's summary denial of defendant's request for a continuance to seek the testimony of Susan Sergeant, one of the buyers in the May 15, 1984 transactions. The record discloses, however, that after learning that Ms. Sergeant pleaded guilty to disorderly conduct on May 16, 1984 to cover a charge of criminal possession of a controlled substance in the seventh degree, based on the May 15th incident, and after having been given a one-day continuance to contact Ms. Sergeant, and after she had abruptly hung up on defendant's investigator, defendant's counsel abandoned this request.

In conclusion we note, however, that the conviction for simple possession should have been vacated and that charge dismissed as a lesser included offense. We would modify accordingly.