(November 12, 1996)

■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v TYRELL BLAIR, Appellant. [650 NYS2d 87] —Judgment of the Supreme Court, New York County (Leslie Crocker Snyder, J.), rendered April 5, 1994, convicting defendant, after trial by jury, of criminal possession of a controlled substance in the first degree, criminal possession of a controlled substance in

the third degree, and two counts of criminal possession of a weapon in the fourth degree, and sentencing him to concurrent prison terms of 15 years to life, $8^{1}/_{3}$ to 25 years, and two terms of one year, respectively, is affirmed.

Initially, we note that defendant's guilt was proved beyond a reasonable doubt by legally sufficient evidence. Upon execution of a search warrant the police found defendant had been sleeping in his room and there were two loaded guns under his mattress and large amounts of cocaine and drug paraphernalia in his closet. The defendant presented three witnesses to support his theory that Benjamin Green, the "informant" who had given the information to the police supporting the issuance of the search warrant, had "planted" the drugs in his closet, and the dissent asserts that this testimony was "[s]upportive of defendant's contention that he had been framed by Green". However, their testimony did not weaken the People's case at all. Blair, the defendant's mother, and Steve Martin testified they were not sure that the bag they saw Green carry into the apartment was the same bag the police recovered from defendant's apartment, and they both testified that they never saw what was inside the bag. Moreover, Martin testified that the bag Green carried into the apartment was *not* big enough to contain all of the drugs and drug paraphernalia that the police found in the apartment. Thus, at the trial, Martin, when asked on cross-examination what was in the bag Green allegedly brought into the apartment, testified:

"I saw him carry the bag. I didn't know what was in the bag.

"Q. My question is based on the size of the bag and the way he was carrying it, *is it possible that he could have had all of those items in that bag?* [The items referred to were those found in the closet, i.e., three scales, 233 glassines of crack, over six boxes of scotch tape and six boxes of masking tape, a box of baking soda, a plastic bag of white vial caps, five boxes of glassine envelopes, which Martin had denied seeing when he was at the apartment].

"A. *No, he couldn't.*" (Emphasis added.)

Finally, even if Green *did* bring drugs into the apartment in the bag, there is no reason to believe defendant was unaware of that fact or of the fact that drugs were in the closet. Blair testified that Green was looking for the defendant when he brought the bag into the apartment. Accordingly, even if believed, the witnesses' testimony did not undermine the People's case.

The rebuttal evidence submitted by the People clearly was " 'evidence in denial of some affirmative fact which the answer-

ing party [defendant] has endeavored to prove' " (*People v Harris*, 57 NY2d 335, 345, *cert denied* 460 US 1047, quoting *Marshall v Davies*, 78 NY 414, 420). While the dissent argues otherwise, it notes this was not a case where the defendant "simply" denied knowing that a large quantity of drugs was in his bedroom closet, but "one in which the defendant specifically attributed his ignorance to a unique circumstance he *affirmatively* sought to prove, namely, that someone else had possessed the narcotics in question" (emphasis added). Accordingly, the rebuttal testimony of Ms. Knott was "evidence in denial of some affirmative fact" which the defendant attempted to prove with his witnesses. Her testimony was admissible to show that defendant knew that he had drugs in his apartment, i.e., disproving his claim that Benjamin Green had placed them there *without his knowledge.* Thus the Court of Appeals has said: " 'guilty knowledge of a defendant may be proved by evidence of his complicity in *similar* offenses under such circumstances as to support the inference that the act charged was not innocently or inadvertently committed' " (*People v Alvino*, 71 NY2d 233, 242, quoting *People v Katz*, 209 NY 311, 328 [emphasis added]). We have also recently noted that "evidence that defendant had also *previously* sold both a real and fake vial of crack cocaine was properly admitted to refute defendant's claim that he did not know that the substance in one of the two vials he sold was crack cocaine and to establish knowledge, and the absence of a mistake or accident" (*People v Rodriguez*, 203 AD2d 92, *affd* 85 NY2d 586 [emphasis added]). The rebuttal testimony of Knott was also admissible to show that defendant knew the weight of the cocaine that he possessed (*see, People v Ryan*, 82 NY2d 497), and to establish his intent to sell the cocaine he possessed (*People v Alvino, supra,* at 245). Also, in *People v Crandall* (67 NY2d 111), cited by the dissent, the Court of Appeals specifically noted that rebuttal evidence of seven *prior* drug sales (which it found improper under the circumstances there) "becomes admissible when a defendant concedes that an illegal transaction occurred but denies legal capacity * * * *or criminal intent"* (*supra,* at 118 [emphasis added]). In this case, defendant conceded that drugs were found in the closet but contested any intent on his part to sell them and any knowledge of their very presence or weight. Finally, the rebuttal testimony was not prejudicial to defendant. The prosecutor never made a propensity argument to the jury, and the court gave proper limiting charges to the jury about the testimony.

We have examined defendant's remaining contentions and find them to be without merit. Concur—Kupferman, Nardelli and Tom, JJ.

Murphy, P. J., dissents in a memorandum as follows: On the morning of June 4, 1993, police, acting under the authority of a "no-knock" warrant issued two days before, performed a search of the apartment where the defendant and his mother, Brenda Blair, resided. In the defendant's bedroom closet they found a brown shopping bag containing some $13^1/_2$ ounces of cocaine and paraphernalia for cutting and packaging narcotics. Two guns were found under the defendant's mattress and $463 was recovered from his dresser. Defendant was thereafter charged with, and following a jury trial, convicted of criminal possession of a controlled substance in the first degree, criminal possession of a controlled substance in the third degree and two counts of criminal possession of a weapon in the fourth degree. On appeal, defendant challenges only the convictions for narcotics possession.

At trial, defendant did not dispute the proof showing that a large quantity of cocaine had been found in his bedroom closet; rather, his defense was predicated entirely on the claim that the drugs had been placed there without his knowledge by one Benjamin Green. Green, described in the trial testimony as an "old friend" of defendant's, had had a brother who, not long before the events here in question, fell victim to a homicide. An investigation into the killing of Green's brother was pending at the time the warrant was issued for the search of the Blair residence, and it is clear that the coincidence of the two investigations was not fortuitous. Green, it appears, believed that defendant was withholding information which might lead to the apprehension of his brother's killer and for that reason decided to furnish the police investigating his brother's death with a means to coerce the defendant into cooperating with their investigation. Indeed, it was in admitted pursuance of this design to avenge his brother's killing that Green provided the principal testimony in support of the application for a warrant to search the Blair residence[1] and it was defendant's contention that this same motive had led Green to plant the bag of narcotics in his closet on the eve of the search authorized on the strength of his testimony. Having by this device assured that the police would, on the occasion of the search he knew to be imminent, discover a large quantity of drugs in the defendant's bedroom, Green, theorized the defendant, would concomitantly have assured the creation of a prosecutorial

---

1. Green explained at the hearing on the warrant application, "My brother was killed, and I figured that Tyrell [the defendant] is holding back information that he can help me put these people away that killed my brother."

context in which defendant would be compelled to barter whatever information he possessed respecting Green's brother's death for leniency, the very unattractive alternative being to risk conviction and a possible sentence of 25 years to life for first degree criminal possession of a controlled substance.

Supportive of defendant's contention that he had been framed by Green was trial testimony by prosecution witness Detective Tebbens confirming that the informant whose testimony constituted the main ground for issuance of the search warrant authorizing the search of defendant's apartment was none other than Green and testimony by three defense witnesses, each of whom stated that on the evening of June 3, 1993—the evening of the day intervening between the issuance of the "no-knock" warrant and its execution—Green arrived at the defendant's door carrying a large brown shopping bag similar to the one the police seized from the defendant's closet the following morning. The defense witnesses stated that, upon his arrival at the Blair apartment, Green indicated that he had come to see the defendant. When he was advised by defendant's mother that defendant was not at home, Green asked whether he might leave his shopping bag in the apartment while he went to find defendant. On receiving permission to leave the bag, Green reportedly went into defendant's room. Defense witness Steve Martin testified that he was present in defendant's room when Green came in with the bag and that he saw Green take the bag into defendant's closet. Martin stated that Green remained in the closet "doing something" for several minutes and then emerged leaving the bag behind.

At the conclusion of the defense case, the People renewed an application first made during their direct case to call Ms. Wanda Knott as a witness; Ms. Knott, it was said, would testify that defendant had in 1992 repeatedly marketed crack cocaine from his apartment. The court, having on the occasion of the People's earlier application effectively denied their request to include Ms. Knott's testimony in their case in chief, had nonetheless expressed the view that her evidence might yet be appropriately received as part of the People's rebuttal case on a *Molineux* theory and it was on that basis that Ms. Knott, over the vociferous objection of the defendant, was permitted to testify. The court ruled that Ms. Knott's testimony would be relevant to rebut the defendant's claim of ignorance as to the presence of drugs in his closet, to show that he intended to sell the drugs and to show, as the prosecution was required to in order to convict the defendant of the first degree possessory of-

fense with which he had been charged, that defendant knew that the drugs he was accused of possessing weighed at least four ounces. Her evidence having thus been deemed probative and, indeed, probative to a degree which, in the court's estimation, outweighed its potential for undue prejudice, Wanda Knott proceeded to testify.

Ms. Knott admitted that she was a drug addict and dealer who sold crack cocaine whenever the opportunity arose and that she in fact had a pending case involving drug related charges. She acknowledged that she had been led to understand that she would be "helped" in her case if she testified against defendant. It was then in pursuance of this understanding that Ms. Knott testified that she had been approached by defendant's "manager" in the late summer or early fall of 1992 and asked if she would sell drugs for defendant. She agreed to do so and thereafter worked for defendant until her arrest in September 1992. During her period of employment with the defendant, Knott claimed to have made sales for him as frequently as two or three days a week. On the days when she was so occupied, Knott stated that she would replenish her supply of "product" by going repeatedly to defendant's apartment where defendant, after answering the door, would retreat to somewhere in the back of the apartment and eventually return with 50 to 100 additional vials of crack for her to sell.

Because Ms. Knott's highly prejudicial testimony depicting defendant as the head of an apparently extensive uncharged conspiracy to market crack cocaine was not properly received as part of the People's rebuttal case, I believe that defendant's convictions for narcotics possession must be reversed and the matter remanded for retrial as to those counts.

Respecting the sort of proof admissible in a rebuttal case, the Court of Appeals has stated, "[t]he rules concerning the proper scope of rebuttal evidence are clear. The party holding the affirmative of an issue must present all evidence concerning it before he closes his case. Thereafter, that party may introduce evidence in rebuttal only. 'Rebutting evidence in such cases means, not merely evidence which contradicts the witnesses on the opposite side and corroborates those of the party who began, *but evidence in denial of some affirmative fact which the answering party has endeavored to prove*' " (*People v Harris*, 57 NY2d 335, 345, *cert denied* 460 US 1047, quoting *Marshall v Davies*, 78 NY 414, 420 [emphasis supplied]; *see also, People v Crandall*, 67 NY2d 111, 118; *People v Alvino*, 71 NY2d 233, 248). The sole affirmative fact defendant endeavored to prove was that Benjamin Green had, unbe-

knownst to him, planted the drugs he was charged with possessing in his closet on the evening of June 3, 1993. Ms. Knott's testimony to the effect that defendant had dealt narcotics from his apartment some nine months before, in the late summer or early fall of 1992, simply did not deny that essential, singular and highly specific affirmative claim. The defendant may have been a drug dealer in 1992 and may still have been framed by Green in 1993; admission of the former circumstance in no way rendered the latter less probable.

The issue raised by the defendant's proof had nothing to do with defendant's propensities to traffic in narcotics; he did not claim that he was an innocent to the drug trade whose life experience would not have disposed him to commit drug related offenses, and not having made any such claim it cannot be said that he set the door ajar for rebuttal proof that his propensities were not so benign (see, People v Alvino, supra, at 247). Indeed, the defendant's proof did not focus upon his own conduct at all, but upon that of Green. And, this being the case, "[t]he refutation of [defendant's claim as to what Green had done] lay in proof that defendant's [claim] was untrue; in proof, if you will, that [Green's] actions, intent, and motives were proper, not of defendant's criminal predisposition to sell drugs" (People v Crandall, supra, at 119).[2] Of course, Green, who would have been the prosecution's logical rebuttal witness, had already testified for the prosecution on the warrant application, and the prosecution's failure to call him as a trial witness to deny the defense claim that he had framed the defendant—a claim he would surely have been able to deny if it had not been so—does not appear to admit of any explanation readily compatible with the defendant's guilt. Green, in contrast to Ms. Knott, avowedly had no pending criminal case[3] with which his testimony might have been impeached and concerns respecting his safety were, by the time of the People's rebuttal case, academic, the People's own witnesses having identified him as the person who had informed against the defendant. Indeed, the People's apparent election to rely upon the testimony of Ms. Knott, who, credibility problems aside, was utterly unable to supply any evidence probative of whether Green had or had not planted narcotics in defendant's closet

2. In Crandall, as here, the issue was whether proof of the defendant's prior narcotics related offenses was relevant to rebut the defendant's affirmative claim that he had been framed. The Court held that it was not.

3. When asked at the hearing upon the warrant application whether his decision to come forward had not been motivated by the wish to "work off" a case of his own, Green replied "No, I don't have any present case myself, no".

on June 3, 1993, instead of the testimony of their own informant who most assuredly would have been able to deny that he had framed the defendant, if the accusation had not been true, is inexplicable if the People's object was in fact rebuttal as opposed to impermissible encouragement of a propensity-based inference of guilt.

The trial court's belief that Ms. Knott's evidence would be responsive to the defense and would therefore be appropriate rebuttal was apparently rooted in a number of rather serious misapprehensions as to what the defendant had actually endeavored to prove. Although the court felt that Ms. Knott's testimony might be responsive to a claim that defendant lacked culpable knowledge of the contraband's weight, the record fails to disclose, and indeed the People fail to cite to, any point at which defendant affirmatively predicated his claim of innocence upon the absence of such knowledge. Similarly absent from the record is any support for the finding implicitly made by the trial court that defendant had somehow affirmatively made an issue of whether he intended to sell the narcotics found in his closet. Nor, contrary to the court's apparent misunderstanding, did defendant affirmatively seek to cast himself as an innocent possessor of contraband thus opening the door to proof of his commission of narcotics possession offenses other than the ones for which he was on trial, the theory behind the introduction of such proof being that it would tend to reduce the probability that the acts for which he was presently called to account had not been culpably performed (*see, People v Molineux*, 168 NY 264, 297-298; *People v Ingram*, 71 NY2d 474, 479; *see also*, 2 Wigmore, Evidence § 351 [Chadbourn rev 1979]). While defendant admitted that drugs were found in his closet, he did not admit possessing them. His defense then did not consist of attempting to characterize an admitted and outwardly ambiguous possession as innocent. His defense, fairly understood, was rather that he had not possessed the drugs at all, that someone else, namely, Green, had possessed the drugs and had been responsible for placing them where they were eventually found. Of course, defendant claimed that he did not know that the drugs had been put in his closet but his claim of innocence was fundamentally premised not on lack of knowledge but lack of possession, the former, under the circumstances of the case, merely being an incident of the latter. This then was not a case in which the defendant simply and inexplicably denied knowing that a large quantity of narcotics had been present in his bedroom closet and by that disclaimer alone sought to avoid the inference that he had illegally exercised dominion and control over the drugs, but one in

which the defendant specifically attributed his ignorance to a unique circumstance he affirmatively sought to prove, namely, that someone else had possessed the narcotics in question and had in the course of that possession put them in his closet where they would shortly be discovered by the police. As noted, this essential claim was in no way negated by Ms. Knott's evidence of defendant's prior drug dealing. Her evidence then ought not to have been admitted in rebuttal.

Contrary to the thrust of much of the People's argument in support of the receipt of Ms. Knott's "rebuttal" testimony, it should be stressed that evidence does not become proper for rebuttal simply because it is in some sense relevant to the proof of the People's case. Indeed, it bears repetition that "[t]he party holding the affirmative of an issue must present all evidence concerning it before he closes his case" *(People v Harris, supra,* at 345). The rebuttal case then does not properly consist of evidence which ought to have been presented in the People's direct case, but of evidence which in addition to possessing the broad qualification of relevance, responds specifically to a claim not yet made at the time of the People's direct case. Accordingly, even if the People are correct that Ms. Knott's testimony was relevant to the proof of the narcotics possession offenses with which defendant was charged, it does not follow that Ms. Knott's testimony was proper rebuttal. Necessary to and absent from the People's argument in justification of the admission of Ms. Knott's evidence as rebuttal is some explanation of the manner in which her evidence may be said to have negated that of the defendant indicating that he was framed. Of course, the gap in argument is entirely understandable since Ms. Knott's evidence manifestly lacked any logical utility for the purpose of showing that Green had not, as the defendant contended and attempted to prove, planted narcotics in defendant's room on the evening of June 3, 1993.

Finally, it should be pointed out that the admission of Ms. Knott's testimony would have been error even if it had not been admitted, as it was, in rebuttal. As the People acknowledge, Ms. Knott's account of defendant's previous drug dealing activities was not admissible to show that he was prone to the commission of crimes such as the ones with which he had been charged, and barring that ground, her evidence of events nine months distant from those at issue at defendant's trial was at best marginally relevant to the proof of defendant's intent to sell the drugs and to the proof of his knowledge of the drugs' weight. Those issues, however, apart from being wholly uncontested, were not ones upon which proof was wanting. It

was undisputed that 13½ ounces of cocaine had been found in the defendant's bedroom along with various items used in the cutting and packaging of the drug and a considerable amount of cash. Surely, the jury would have had no trouble concluding based on this evidence that, if the defendant had indeed exercised dominion and control over so large a quantity of narcotics, he had done so for the purpose of selling it and that since he evidently intended to engage in an extensive drug marketing operation he had some reasonably precise notion of the amount of narcotics he had available to sell. Certainly, given the fact that the drugs in question weighed in excess of three times the four ounce minimum necessary to sustain a conviction for criminal possession of a controlled substance in the first degree, the inference that the defendant knew that the drugs weighed at least four ounces would not have been difficult for the jury. The disposition of these issues then—the issues as to which Ms. Knott's testimony may have had some legitimate bearing—would have been easily settled in favor of conviction once the jury had concluded that defendant had in fact possessed the drugs found in his closet. This being the case, the probative value of Ms. Knott's testimony was exceedingly small; it did not and could not be adduced to prove possession since, in that capacity, it would simply have been propensity evidence and was entirely unnecessary in proof of what would follow ineluctably if possession was by other evidentiary means established as it had to be in order for the prosecution to prevail. To be contrasted with the minute probative value of Ms. Knott's evidence, however, was its immense potential for causing undue prejudice. The defendant was portrayed by Ms. Knott as a fairly high-level drug trafficker—one whose dealings were extensive enough to warrant his employment of a mid-level "manager" in addition to lower-level sales personnel such as Ms. Knott. Moreover, according to Ms. Knott, it was defendant's practice to conduct his business and dispense his "product" to his salespersons from the very apartment where the narcotics he would subsequently be charged with possessing were found. Surely the admission of this evidence raised the danger that the jury would convict the defendant because of his richly resonant history of drug dealing and not because of the evidence legitimately probative of the specific possessory offenses charged, and it was undoubtedly in recognition of the considerable risk of the jury's misuse of evidence whose legitimate applications were so minimal, that the trial court effectively declined to allow such evidence to be admitted as part of the People's direct case. The trial court's evidentiary calculus, to this point unexceptionable,

became problematic, however, when the court determined that the defense case had endowed Ms. Knott's proof with a significant additional increment of probative worth, for as has already been demonstrated, the defense case properly understood did nothing of the sort. Ms. Knott's evidence simply had no logical probative value as a counterpoint to defendant's affirmative claim that Benjamin Green had been responsible for the contraband's presence in his bedroom. At the time of its receipt in evidence, Ms. Knott's testimony remained as it had been thereto, no more than marginally probative of altogether uncontested issues, yet instinct with enormous potential to prejudice the jury's consideration of the one crucial issue which was contested, namely, whether defendant had in fact possessed the drugs found in his closet.

The defendant may have been a drug dealer, but the proof of his prior illicit activities did not make it any less likely that he had, as he contended, been framed. The jury, however, was effectively instructed otherwise. It was told that it could infer from Ms. Knott's account of defendant's drug trafficking activities in 1992 that he knew that there were drugs in his room on the morning of June 4, 1993.[4] That instruction, although purporting to limit the jury's use of the evidence, was little, if at all, different under the facts of this case in which proof of knowledge was tantamount to proof of culpable possession, from instructing the jury that it might simply find the defendant guilty of the possessory offenses charged because he had been a drug dealer. This line of inculpatory inference resting entirely upon suppositions as to what might follow from the defendant's propensities is not permitted by the law and the reason for the prohibition is well-illustrated by this case. An individual's propensity may seem to prove much, but its actual potency as a causative factor may be and often is blunted or entirely negated by intervening causes, among them the propensities and conduct of others. Here, the defendant adduced evidence that the presence of drugs in his closet on June 4, 1993 was attributable to someone else's conduct, conduct which may have occurred notwithstanding any criminal propensities with which the defendant himself might have been tagged. Yet, the jury was expressly encouraged to discount this hypothesis of innocence not because of proof showing it to be false but on the basis of proof appealing to the probatively

---

4. The court instructed the jury that the People had "offered the evidence for the purpose of showing that defendant had knowledge of the presence of drugs in his apartment" and that the evidence could be considered for that purpose.

seductive but highly suspect notion that a defendant's bad character is supremely explicative of all the wrongdoing with which he has been charged. If the People were, for whatever reason, unable to rebut the defendant's contention that he had been framed, that critical weakness in their case ought not to have been masked by the introduction of Ms. Knott's wholly unresponsive, distracting and indeed incendiary evidence. The admission of that evidence, particularly in the guise of "rebuttal", did not serve the truth-seeking process and may well have caused a wrongful conviction.

Accordingly, the judgment of the Supreme Court, New York County (Leslie Crocker Snyder, J.), rendered April 5, 1994, convicting defendant, after a jury trial, of criminal possession of a controlled substance in the first degree, criminal possession of a controlled substance in the third degree, and two counts of criminal possession of a weapon in the fourth degree should be modified, on the law, to the extent of vacating the convictions for narcotics possession and remanding for retrial as to those counts and, except as so modified, affirmed.