UNITED STATES of America, Appellee,

v.

Raoul RIVALTA, Defendant–Appellant.

UNITED STATES of America, Appellee,

v.

Fausto RIVALTA, Defendant–Appellant.

Nos. 208, 209, Dockets 89–1159, 89–1186.

United States Court of Appeals,
Second Circuit.

Argued Oct. 12, 1989.

Decided Dec. 21, 1989.

**224**

Peter J. Kahn, Washington, D.C. (Williams & Connolly, Thomas J. Murphy, of counsel), for defendants-appellants Raoul Rivalta and Fausto Rivalta.

Peter M. Kougasian, New York City, Sp. Asst. U.S. Atty. S.D. New York (Benito Romano, U.S. Atty. S.D. New York, J. Gilmore Childers, David E. Brodsky, Asst. U.S. Attys., of counsel), for appellee.

Before KAUFMAN, FEINBERG and CARDAMONE, Circuit Judges.

FEINBERG, Circuit Judge:

Raoul and Fausto Rivalta appeal from judgments of conviction, and from sentences imposed thereon, on one count of interstate transportation of stolen property in violation of 18 U.S.C. § 2314, and one count of sale of stolen property in violation of 18 U.S.C. § 2315. The Rivalta brothers were tried separately, and were represented by separate counsel, before a jury and Judge Kevin T. Duffy in the United States District Court for the Southern District of New York. Raoul and Fausto Rivalta were sentenced, on March 21 and April 12, 1989 respectively, to ten years of imprisonment on each count, to be served consecutively, and a fine of $500,000. They took separate appeals, which have been heard by the same panel at their request.

Because appellants' underlying acts occurred after November 1, 1987, the Federal Sentencing Guidelines (Guidelines) apply. The judge imposed the statutory maximum on each defendant on each count, departing approximately tenfold from the high end of the recommended range of imprisonment in the Guidelines for the two crimes considered together. Appellants raise a number of issues in their appeals, including whether the judge could properly find that the Rivalta brothers' criminal activity resulted in death and whether the judge's upward departure from the Guidelines was justified.

For reasons given below, we affirm the convictions of each appellant, but remand for further findings regarding, and reconsideration of, the sentences.

## I. Background

The government maintains that its evidence at trial demonstrated that the Rivalta brothers knowingly transported and sold a stolen 3.97 carat diamond and that this diamond was acquired by means of an elaborate ruse. This ruse purportedly involved convincing Barbara Mangiameli, a neophyte, free-lance diamond dealer, that the brothers could introduce her to a diplomat interested in purchasing investment-quality diamonds. In support of its theory, the government introduced evidence from which a jury could find the following:

Ms. Mangiameli resided in the same apartment building as Fausto Rivalta, a friend and neighbor. His older brother Raoul held a clerical position at the investment firm of Bear, Stearns & Co., and had financial problems. On February 1, 1989, Mangiameli called free-lance diamond dealer Charles Fischler and informed him that she needed investment-quality diamonds for a potential purchaser, who was a client of Fausto's brother Raoul, "the vice president of Bear, Stearns brokerage firm." The next day, Mangiameli again phoned Fischler to inquire about the amount of commission Raoul Rivalta would earn if his client purchased the diamonds, and during this conversation she indicated that Raoul was present in her apartment.

On February 3, 1989, Fischler gave Mangiameli a total of six diamonds, including a flawless, pear-shaped, 3.97 carat diamond. The six diamonds had an aggregate value of over $500,000; the 3.97 carat diamond had been purchased earlier for $48,000. (Appellants were convicted for the transportation and sale of the 3.97 carat diamond; the other five diamonds have apparently never been recovered). Mangiameli indicated to Fischler that the prospective purchaser was a Third World diplomat, with whom she had an appointment to meet that evening at the United Nations. Shortly before the scheduled meeting, Fausto Rivalta called Mangiameli and informed her that the appointment was cancelled because the diplomat had a function to attend. Mangiameli was upset by the change in arrangements, but later that evening she had dinner with the brothers, and they went over the diamond deal with her.

On the morning of February 4, 1988, the diamonds were still in Mangiameli's possession. That morning, she cancelled a lunch meeting with a potential customer (and friend), explaining that Raoul Rivalta had arranged a noontime business meeting at the United Nations with a diplomat. Later that morning, at 11:49, Raoul placed a telephone call to Fausto at his apartment. The conversation, which took place in Italian, was recorded by Bear, Stearns. (That company had a practice of taping the outgoing calls of its employees). According to the government's translation, Fausto told Raoul, "She came here and went out again, she went up and I couldn't do anything," adding, "She came here and she didn't want anything to drink." Raoul indicated that he was coming to Fausto's apartment, and four minutes later, at 11:53, clocked out of work. At 12:30 p.m. a neighbor saw Mangiameli talking into the intercom in the vestibule of their apartment building, saying "Fausto, I can't hear you ... Faust." Family, friends and acquaintances never saw or heard from Mangiameli again.

At about 5:00 p.m. on February 4, the Rivalta brothers went to a Manhattan car rental agency and requested a station wagon or minivan. The brothers, after being informed that no such vehicles were available, accepted a hatchback. On the evening of February 5, 1988, a Friday, Fausto Rivalta asked a friend to use her credit card to obtain two airline tickets to Italy, one departing on Sunday and the other on Monday. He insisted on these departure dates.

The next morning, February 6, 1988, Fausto Rivalta called this friend from a public pay phone about the tickets. She had learned that the police wanted to speak to Fausto in connection with a missing person, and she refused to help him until he spoke with the police. That night, the brothers did not return to their homes. On or after February 8, the brothers left New York City, and travelled to Florida in their rented hatchback.

On February 16 or 17, 1988, Fausto Rivalta sold the 3.97 carat diamond at a West Palm Beach pawn shop for $14,000 in cash, approximately one-quarter of its value. On or about February 26, 1988, Raoul Rivalta returned to New York in the rented hatchback, and abandoned the car on a New York street.

Subsequently, Raoul and Fausto Rivalta made lengthy, videotaped statements, on separate occasions, at the Office of the District Attorney, New York County. Both admitted to meeting with Mangiameli, viewing the diamonds, and discussing the possibility of Raoul's arranging a diamond deal with his "wealthy friends." The brothers both insisted that this meeting occurred on Tuesday, February 2, two days before Mangiameli's disappearance, and that the deal had been called off on February 3, 1988. Raoul claimed never to have seen Mangiameli again after the February 2, 1988 meeting. Fausto also indicated that he last saw Mangiameli on that date (or possibly on the morning of either February 3 or 4), a claim contradicted by his contention now to us that Mangiameli met him in Florida in mid-February and asked him to sell the diamond. The brothers also made other false exculpatory statements during these sessions, including conflicting explanations for rental of the hatchback, such as Fausto's claim that he rented the car to move about 20 "big books" belong-

ing to Raoul, although Raoul had no such recollection.

Raoul and Fausto Rivalta were indicted in April 1988 on the charges that are the subject of these appeals. Raoul neither testified at his trial nor called any witnesses. Fausto Rivalta called two witnesses at his trial. Robert Hodges testified that he had served Fausto Rivalta and Barbara Mangiameli in a West Palm Beach restaurant in mid-February 1988. Victor De Simone, a per diem Italian translator employed by the United States Attorney's Office for the Southern District of New York, testified that he had provided the government with a different translation of the brothers' telephone conversation of February 4, 1988. The witness suggested that the government's translation of a statement by Fausto as "she didn't want anything to drink" was inaccurate.

After an eight-day trial, the jury found Raoul Rivalta guilty of one count of interstate transportation of stolen property and one count of disposing of stolen property. Two months later, after a four-day trial, a different jury found Fausto Rivalta guilty on the same counts.

Raoul Rivalta was sentenced on March 21, 1989; Fausto was sentenced on April 11. When sentence was imposed on each defendant, Judge Duffy had before him not simply the evidence adduced at the respective trials, which included a lengthy videotaped statement of the defendant on trial, but also individual government sentencing memoranda detailing some facts regarding Mangiameli's death. Her stripped, bound and beaten body had been recovered on June 9, 1988 from a garbage bag floating in the harbor of lower Manhattan. No one has been indicted in connection with her murder.

The government's sentencing memoranda set forth the evidence linking the Rivalta brothers to Mangiameli's death, and contended that "the inference is unavoidable that Ms. Mangiameli's death was a result of the transaction in which defendant was the primary participant." For this reason, in the case of Fausto Rivalta, the government urged an upward departure from the combined guideline range for the two offenses of 21–27 months. In the case of Raoul Rivalta, the government urged an upward departure from the guideline range of 18–24 months. At the sentencing hearings, the judge indicated his belief, as explained more fully below, that Barbara Mangiameli's death and the Rivaltas' crimes were "intertwined" or that there was a "nexus" between them. He departed upwardly from the recommended guideline range for this reason, imposing on both Rivaltas consecutive ten-year sentences on each count. These appeals followed.

## II. Discussion

### A. Sufficiency of the Evidence

■ Appellants challenge the sufficiency of the evidence against them on both counts on which they were each convicted. With respect to the interstate transportation count, Raoul argues that the government failed to establish the whereabouts of the 3.97 carat diamond between its possession in New York by Mangiameli on February 4, 1988 and its possession in Florida by Fausto Rivalta for purposes of sale on February 16 or 17, 1988. Raoul claims that the evidence was insufficient to establish that the diamond was transported in the car that the brothers drove to Florida. Moreover, even assuming that a jury could reasonably infer from Fausto's sale of the diamond in Florida that Fausto transported it from New York, the jury could not reasonably infer from Raoul's accompanying his brother to Florida that Raoul knew that a diamond was being transported and that it was stolen.

With respect to the sale of stolen property count, Raoul argues that the testimony at trial established that his brother was alone when he sold the diamond, and the only evidence relied on by the government to support this count against Raoul came from his response, "yes, exactly, yes," to an interrogator's question during the videotaped interview, "So you never really were apart up until you left [Florida?]" Even assuming that a jury could reasonably infer from such a general avowal of close companionship that Raoul was nearby

when his brother sold the diamond, Raoul argues that mere presence is insufficient to support an aiding and abetting conviction.

In his separate challenge to the interstate transportation count, Fausto Rivalta contends, among other things, that Barbara Mangiameli was responsible for transporting the diamond to Florida, where she contacted him in mid-February 1988 and asked him to sell the diamond for her. Even assuming that the jury reasonably inferred that Fausto had transported the diamond from New York to Florida, and further, that the diamond was stolen, there was no evidence from which a jury could have concluded that he knew the diamond was stolen. Fausto stresses that an inference of guilty knowledge based on mere possession is impermissible, where, as here, possession can be explained in a way consistent with innocence; he claims that he had good reason to believe that he had full authority to possess the diamond and was authorized to help Mangiameli since he had occasionally done so in the past. With respect to the sale count, Fausto argues that a jury could not legitimately draw an inference of guilty knowledge from the fact that he sold the diamond for a fraction of its previous purchase price. He says that the value of a diamond cannot be readily ascertained without expertise and instrumentation, and he was not a specialist in precious stones.

Our precedents make clear that a defendant challenging the sufficiency of the evidence bears a very heavy burden. See, e.g., *United States v. Zabare*, 871 F.2d 282, 286 (2d Cir.), cert. denied, — U.S. —, 110 S.Ct. 161, 107 L.Ed.2d 119 (1989). As indicated above, there was evidence that the brothers met with Mangiameli, viewed the diamonds and discussed the possibility of Raoul's placing the gems with clients interested in investment-quality diamonds. The diamonds were in the possession of Mangiameli on the morning of February 4, 1988, the day of her disappearance; she expected, at Raoul's arrangement, to meet with a Third World diplomat that day regarding a diamond purchase; at least Fausto met with her that day; and the last time anyone saw Mangiameli, she was in his (and her) apartment building, talking to him on the intercom. Subsequently, the brothers tried to make plans to leave the country in the next few days, and finally fled together to Florida in a hurriedly rented car. On February 16th or 17th, Fausto Rivalta entered the pawn shop and sold the 3.97 carat diamond for a fraction of its value, for which he received cash; and the brothers were virtually inseparable until the diamond was sold. Raoul Rivalta subsequently had a large supply of cash, for which he could not plausibly account. Raoul returned in the rented car and abandoned it, and thereafter both brothers made false, exculpatory statements to authorities. Moreover, Fausto Rivalta's contention at trial that Mangiameli herself transported the diamond in interstate commerce and asked him to sell it on her behalf is not plausible. Fausto sold the diamond for a fraction of its value, yet Mangiameli remained fully liable by virtue of having signed a consignment memorandum.

The theory of the government's case was, as appellants point out, that "the Rivalta brothers were engaged in ... [an] elaborate hoax ... to separate Barbara Mangiameli from certain diamonds she had received on consignment." Appellants assert that "[t]he government's case lives or dies by its ability to support this alleged scheme," and that the government failed to do so. The former assertion may be correct, but the latter is not; the evidence that there was such a hoax is strong. Both brothers give exculpatory explanations for individual pieces of evidence offered by the government to support its allegations. Thus, appellants maintain that the only evidence of the alleged scheme is that Mangiameli informed others that Raoul would introduce her to a Third World diplomat. However, we agree with the government that appellants' arguments rest upon a "microscopic dissection of bits and pieces of evidence." *United States v. Dardi*, 330 F.2d 316, 325 (2d Cir.), cert. denied, 379 U.S. 845, 85 S.Ct. 51, 13 L.Ed.2d 50 (1964). Viewing each strand of evidence " 'not in isolation but in conjunction' " and noting

that the government "need not 'exclude every reasonable hypothesis, other than that of guilt' to support a conviction," *United States v. Carson*, 702 F.2d 351, 362 (2d Cir.) (citations omitted), cert. denied, 462 U.S. 1108, 103 S.Ct. 2456, 77 L.Ed.2d 1335 (1983), we conclude that the Rivalta brothers have not met their heavy burden in challenging the sufficiency of the evidence against them on either count.

### B. *Other Claims of Trial Error*

■ Raoul Rivalta also advances two independent claims, applicable only to his appeal. The first is that the district court erred in denying his motion under Fed.R. Crim.P. 33 for a new trial based on newly discovered evidence—specifically, the testimony of Robert Hodges at Fausto's trial (which began about 10 weeks after Raoul's ended) that Mangiameli was in Florida in mid-February 1988. Raoul maintains that he has made the requisite showing for the grant of a Rule 33 motion. "[T]he evidence could not with due diligence have been discovered before or during trial, ... the evidence is material, not cumulative, and ... admission of the evidence would probably lead to an acquittal." *United States v. Alessi*, 638 F.2d 466, 479 (2d Cir.1980). However, the assumption that Raoul with due diligence could not have discovered this evidence produced by his brother is dubious. Even if we accept that proposition along with the additional assumption that the evidence was material and not cumulative, we cannot say that the evidence would probably have led to an acquittal in view of the highly suspect nature of Hodges's identification of Fausto Rivalta and Barbara Mangiameli. On cross-examination, Hodges admitted that he never saw the couple before or after that one dinner and that the first two times he was shown photographs of Fausto and Barbara, he was unable to make a positive identification. In returning its guilty verdict in Fausto's case, the jury obviously found that Hodges's testimony was either unworthy of belief or beside the point.

■ Raoul also argues that the district court improperly denied his motion for mis-trial because of prejudicial publicity. First, he contends that the jurors were exposed to "sensationalistic and speculative" press and television accounts directly and repeatedly linking the Rivaltas to Mangiameli's death, despite the district court's determination that information regarding Mangiameli's death was too prejudicial to be admitted at trial. However, there is no indication that the jurors were exposed to the "sensationalistic" news reports that appellant cites to us, all of which appeared well before the trial (most of them five months before). Rather, although an alternate juror informed the court that "[o]ne of the jurors said, I know they found the body, I read it in the paper," the judge's individual voir dire of each juror revealed that most had no more than hazy or vague knowledge of any publicity.

■ Second, appellant argues that the trial judge did not conduct an appropriate voir dire. This court has established a three-step process for "a district court to follow when the problem of widely disseminated publicity" may prejudicially affect an ongoing criminal trial:

> [F]irst, to determine whether the coverage has a potential for unfair prejudice, second, to canvass the jury to find out if they have learned of the potentially prejudicial publicity and, third, to examine individually exposed jurors—outside the presence of the other jurors—to ascertain how much they know of the distracting publicity and what effect, if any, it has had on that juror's ability to decide the case fairly.

*United States v. Gaggi*, 811 F.2d 47, 51 (2d Cir.), cert. denied, 482 U.S. 929, 107 S.Ct. 3214, 96 L.Ed.2d 701 (1987). Raoul concedes that Judge Duffy "correctly followed the first two steps"; however, he contends that the judge's individual examinations were inadequate and inconclusive because he failed to question each and every juror regarding continued impartiality. The governing standard, however, requires only that the district judge "ascertain" the continued impartiality of exposed jurors; it does not require the judge to question the jurors explicitly on this question in order to

arrive at this determination. Moreover, although one juror had heard that Mangiameli had been "found dead," and another had heard that Mangiameli had been murdered and not all of the diamonds recovered, both jurors gave assurances of their continued impartiality in response to further questioning by the district court. Furthermore, the defense did not ask for additional voir dire on the question of impartiality.

We do not believe that Judge Duffy abused his discretion. "[W]e will rarely second-guess [the trial judge's] assessment that the jury's impartiality was not prejudicially affected by the publicity," where, as here, the following conditions have been met:

> (1) the publicity does not focus directly on the issue of the defendant's guilt or innocence with respect to the charges in the ongoing trial, (2) much of the potentially prejudicial matter has been adduced as competent evidence at trial, (3) the trial judge has taken prompt action to determine the effect of the publicity on the jurors, and (4) the judge has given or offered to give cautionary instructions . . . .

*United States v. Gigante*, 729 F.2d 78, 82 (2d Cir.), cert. denied, 467 U.S. 1206, 104 S.Ct. 2390, 81 L.Ed.2d 348 (1984). Applying these factors to this case, we first note that the allegedly prejudicial publicity did not directly address the charges on interstate transportation and sale of stolen property. Second, in the context of this case, the fact that some jurors had learned of Mangiameli's death was unlikely to have prejudiced the jury, since, as part of its proof at trial, the government had demonstrated that Mangiameli had disappeared on February 4, 1988, and was not seen thereafter by friends, associates or family. Third, the trial judge questioned the jurors the morning after the potential prejudice was brought to his attention. Finally, the judge offered to give a curative instruction to the jury. We thus see no basis in the record for disturbing his conclusion, given his superior position to observe demeanor and assess credibility. Id. at 82.

In addition, Raoul argues that the insufficiency of the voir dire was aggravated by duplicity on the part of at least one juror. Almost all the jurors indicated that at least one juror had read and divulged information regarding Mangiameli, yet no juror admitted to being that person. However, since Raoul objected to the court's offer to discharge the juror identified as the one responsible for disclosing the publicity, appellant cannot now complain.

## C. *Legality of the Sentence*

The applicable sentence range under the Guidelines for the offenses on which Raoul Rivalta was convicted was 18–24 months; the range for Fausto was 21–27 months. Instead, they each received a sentence of 10 years on each count to be served consecutively, or a total for each of 20 years.

The Sentencing Reform Act of 1984, under which the Guidelines were promulgated, directs a sentencing judge to "consider," among other things, "any pertinent policy statement issued by the Sentencing Commission in effect on the date the defendant is sentenced." 18 U.S.C. § 3553(a)(5). Policy Statement § 5K2.1, which the government called to Judge Duffy's attention, provides:

> If death resulted, the court may increase the sentence above the authorized guideline range.

> Loss of life does not automatically suggest a sentence at or near the statutory maximum. The sentencing judge must give consideration to matters that would normally distinguish among levels of homicide, such as the defendant's state of mind and the degree of planning or preparation. Other appropriate factors are whether multiple deaths resulted, and the means by which life was taken. The extent of the increase should depend on the dangerousness of the defendant's conduct, the extent to which death or serious injury was intended or knowingly risked, and the extent to which the offense level for the offense of conviction, as determined by the other . . . guidelines, already reflects the risk of personal injury. For example, a substantial

increase may be appropriate if the death was intended or knowingly risked or if the underlying offense was one for which base offense levels do not reflect an allowance for the risk of personal injury, such as fraud.

United States Sentencing Commission Guidelines Manual (Nov. 1989) (hereinafter U.S.S.G.) § 5K2.1, p.s. The Rivaltas challenge their sentences, contending in each case that the sentence was unreasonable and a violation of due process.

■ At the outset, it is important to note what appellants do not contend. They do not argue that a resultant death is an inappropriate basis for increasing a sentence or that the government must establish disputed sentencing factors by more than a preponderance of the evidence. As appellants recognize, this court in *United States v. Lee*, 818 F.2d 1052 (2d Cir.), cert. denied, 484 U.S. 956, 108 S.Ct. 350, 98 L.Ed.2d 376 (1987), a pre-Guidelines case, "adopt[ed] the preponderance of the evidence standard for federal sentencing fact-finding." Id. at 1057. In *Lee*, a major consideration in the imposition of a 20-year sentence on a defendant after a guilty plea was proof, submitted for a sentencing hearing, of defendant's participation in a double murder; we specifically held that the preponderance standard satisfies "a federal defendant's due process rights." Id. After this appeal was argued, this court decided *United States v. Guerra*, 888 F.2d 247 (2d Cir. 1989). The issue before the court in *Guerra* was "the requisite standard of proof to establish 'relevant conduct' under the Sentencing Guidelines." Id. at 248 (quoting U.S.S.G. § 1B1.3). The court held that "the preponderance of the evidence standard satisfies the requisite due process in determining the relevant conduct pursuant to the Sentencing Guidelines." *Guerra*, at 251. We discern no significant difference between disputes concerning "relevant conduct" for purposes of calculating offense levels under the Guidelines and those concerning a resultant death for purposes of justifying an upward departure. Thus, the preponderance of the evidence standard governs here.

Appellants claim that the judge's upward departure from the Guidelines was unreasonable and a violation of due process "because the information relied upon was speculative, unsupported, and unreliable." The issues that appellants press upon us are whether the district court had sufficient evidence before it to find by a preponderance of the evidence that the activity of the Rivalta brothers resulted in the death of Mangiameli, and if so, whether the district court's upward departure was reasonable. We do not think the due process argument adds anything to analysis on these issues. As to the former issue, the government cannot meet its burden, even under only a preponderance standard, with evidence that is "speculative, unsupported, and unreliable." As to the latter issue, it has long been the law that sentences not exceeding the statutory maximum, even if they are to run consecutively, are not unconstitutional. See *Lee*, 818 F.2d at 1055 (maximum sentence did not violate due process); *Garrett v. United States*, 471 U.S. 773, 793–95, 105 S.Ct. 2407, 2418–20, 85 L.Ed.2d 764 (1985) (consecutive sentences do not violate Double Jeopardy Clause). Of course, an argument can be made—and frequently is—that a particular sentence violates the Eighth Amendment's proscription against cruel and unusual punishment, but the argument is rarely successful. But see *Solem v. Helm*, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983) (Eighth Amendment proscribes a life sentence without possibility of parole for a seventh nonviolent felony). More significantly, such an unconstitutional sentence would clearly be "unreasonable" within the meaning of 18 U.S.C. § 3742(e)(3), which is the governing statutory standard. See *United States v. Correa–Vargas*, 860 F.2d 35, 36–37 (2d Cir. 1988).

■ Accordingly, we turn first to whether the information offered by the government could be regarded as establishing by a preponderance of the evidence that Mangiameli's death resulted from the criminal activities of the Rivaltas. In considering that question, Judge Duffy could reasonably have taken into account the following evidence, all of which was introduced at the

trials before him: The brothers, one of whom had financial problems, concocted an elaborate scheme to gain possession of the diamonds held by Mangiameli. On the day of her disappearance, Fausto Rivalta sought to detain Mangiameli and wanted her to have a drink when she came to his apartment; after her departure, the two brothers had an urgent and suspicious phone conversation regarding Mangiameli's whereabouts; Fausto told his brother that she left before he could "do anything." Raoul immediately left work and rushed to Fausto's apartment; within the hour, Mangiameli was seen and heard in the building speaking on the intercom to Fausto, after which she was not seen alive again; later that day, the brothers attempted to rent a minivan or station wagon. Additionally, in the days immediately following Mangiameli's disappearance, the Rivaltas made abortive plans to leave the country; upon learning that the police were looking for Fausto Rivalta, the brothers did not return to their residences, and together finally fled to Florida. Both Rivaltas subsequently made false exculpatory statements to the police.

Appellants make much of the failure of the medical examiner to fix a time of death. In April 1988, appellants were arrested and incarcerated pending trial, and Mangiameli's body was not found until June 1988. It is true that the government, in its sentencing memoranda, admitted that "[t]he medical examiner was unable to fix time of death even generally," but the memoranda went on to say that the examiner "stated that the medical evidence was not inconsistent with [Barbara Mangiameli] being killed on February 4, 1988." Appellants maintain that the medical examiner's failure to fix a time of death is at least equally consistent with Mangiameli having been killed after the Rivaltas were already in pretrial detention, rather than prior to their departure for Florida, as the government contends. Appellants also emphasize that no witnesses link the Rivaltas to Mangiameli's death, and the only physical evidence—the body—is inconclusive as to the time of death.

We do not find these arguments convincing. As indicated above, the government presented persuasive circumstantial evidence connecting the Rivaltas with Mangiameli's death, so that the absence of physical evidence or witnesses is not dispositive. Moreover, although the official autopsy report fixed no time of death, the medical examiner did indicate that the medical evidence was not inconsistent with Mangiameli having been killed on February 4, 1988, a conclusion the district court could credit. Appellants stress that a lengthy joint federal and state investigation of Mangiameli's death did not produce an indictment, and that the district court should have credited the judgment of these professional investigators regarding the insufficiency of the evidence. However, we were informed at oral argument that an investigation into the murder remains open, and we have no reason to doubt that. Moreover, a responsible prosecutor, aware of the government's burden in a criminal case to persuade the jury beyond a reasonable doubt, might not seek an indictment even though there was sufficient evidence to satisfy the lower standard of proof by a preponderance of the evidence.

■ Our principal problem is not with the alleged paucity of the evidence linking the Rivaltas with Mangiameli's death in some way, but with how the district court viewed that linkage. As § 5K2.1 makes clear, "[l]oss of life does not automatically suggest a sentence at or near the statutory maximum." Among the appropriate factors to consider in determining the extent of the departure is "the extent to which death or serious injury was intended or knowingly risked, and the extent to which the offense level for the offense of conviction ... already reflects the risk of personal injury." Id. If either of these two factors are found, "a substantial increase may be appropriate." The offense level involved here, see U.S.S.G. § 2B1.2 ("Receiving, Transporting, Transferring, Transmitting, or Possessing Stolen Property"), does not reflect the risk of personal injury. That factor, therefore, along with the nature of the determination of "the extent to which death or serious injury was intended or knowingly risked," vests a great deal of discretion in the district court

in this case. See *United States v. Melton*, 883 F.2d 336 (5th Cir.1989) (30–year departure sentence under § 5K2.1 not excessive for death of kidnapping victim, who panicked and jumped out of kidnapper's car); *United States v. Salazar–Villarreal*, 872 F.2d 121, 122 (5th Cir.1989) (upward departure under § 5K2.1 justified on the basis of "reckless flight" of defendant transporting illegal aliens "and the resulting death and injury which [flight] caused"); cf. *United States v. Spinney*, 795 F.2d 1410, 1415–16 (9th Cir.1986) (pre-Guidelines case, which, in an analogous situation, analyzed whether death resulted from defendant's conduct in terms of cause in fact and proximate cause).

Policy Statement § 5K2.0 provides that "[t]he controlling decision as to whether and *to what extent* departure is warranted can only be made by the court at the time of sentencing." Id. (emphasis supplied). We acknowledge that, but we are troubled by the district court's failure to make an explicit finding that, in the words of § 5K2.1, Mangiameli's death "resulted" from the Rivaltas' criminal activity. Indeed, at one point, the judge stated to Raoul Rivalta that the "facts would indicate that at best you were an accessory after the fact." If the Rivaltas were only accessories after the fact, they could not have caused Mangiameli's death, since, unlike accessories before the fact, the brothers would simply be obstructers of justice, rather than parties to the murder. See 1 C. Torcia, Wharton's Criminal Law § 35 (14th ed. 1978). Furthermore, it is not enough for the district court to conclude, as it did, that there was a "nexus" between "the disappearance of the deceased and the disappearance of the diamonds," or that they were "intertwined." To justify an upward departure under § 5K2.1 on these facts,

Judge Duffy would have to find that "death or serious injury was intended *or* knowingly risked" (emphasis supplied). Accordingly, we believe that it is appropriate to remand to the district court for more explicit findings as to the sentences.

In addition, in the absence of an explicit finding that the Rivaltas "intended" or "knowingly risked" Mangiameli's death, any upward departure under § 5K2.1 would be inappropriate.[1] On remand, if the district court finds that the Rivaltas were only accessories after the fact, then § 5K2.1 would not apply. In that event, Mangiameli's death would not have "resulted" from their criminal conduct, and the brothers' obstruction of justice would already have been taken into account by the two-point increase each received in the calculation of their guideline ranges. This court recently observed that the extent of an upward departure is not "boundless," emphasizing that such a departure "occurs within a range from the top of the applicable guideline up to the statutory maximum, an area that will often cover an extensive span of imprisonment." *United States v. Coe*, 891 F.2d 405 at 413–14 n. 9 (2d Cir.1989). "In an era of flat time sentencing without parole, the extent to which a sentence departure should traverse such a broad span is a matter deserving of caution." Id. Moreover, the Guidelines direct that closely related counts be grouped together, see U.S.S.G. § 3D1.2, in order to base the total punishment on a combined offense level applicable to each group of closely related counts. See U.S.S.G. §§ 3D1.3, 3D1.4, 3D1.5. Thus, the philosophy behind the Guidelines is to prevent "multiple punishment for substantially identical offense conduct" by taking the most serious offense as a starting point and providing "incremental punishment for significant ad-

---

1. The government also urged departure on the basis of another Policy Statement:

    If a victim or victims suffered psychological injury much more serious than that normally resulting from commission of the offense, the court may increase the sentence above the authorized guideline range.

    U.S.S.G. § 5K2.3, p.s. The government's theory was that defendants' silence or misrepresentations regarding Barbara Mangiameli's where-

abouts inflicted "psychological torture" on the Mangiameli family, who, from the date of her disappearance on February 4, 1988 until the discovery of her body on June 9, 1988, did not know whether she was "dead or alive; restrained or drugged or tortured." While we find the government's argument persuasive, the district court did not appear to deal with it, presumably basing its upward departure solely upon § 5K2.1.

ditional criminal conduct," with the amount of additional punishment decreasing as the number of additional offenses increases. U.S.S.G. Ch. 3, Pt. D, intro. comment.

Here, the judge imposed the statutory maximum on both counts and then ordered that the sentences run consecutively. The departure was from roughly two years to 20. Such an overwhelming departure would run counter to the caution this court has counselled and the philosophy of the Guidelines of grouping offenses together, unless supported by an explicit finding that defendants "intended" or "knowingly risked" Mangiameli's death. § 5K2.1. However, the authority to make such a finding lies with the district court, not us. Accordingly, we remand to the district court for further findings with regard to, and reconsideration of, the sentences.

For the reasons given above, we affirm the convictions of both appellants. However, we remand for further findings with regard to, and reconsideration of, the sentences, in accordance with this opinion. Any further appeal should come to this panel, if practicable.