**Jon–Adrian VELAZQUEZ, Petitioner,**

**v.**

**Brian FISCHER, Respondent.**

**No. 06 CIV. 5537(DC).**

United States District Court,
S.D. New York.

Nov. 28, 2007.

---

29. *Gurary,* 190 F.3d at 43–44.

Jon–Adrian Velazquez, Ossining, NY, pro se.

Robert M. Morgenthau, Esq., District Attorney, New York County, by Christopher P. Marinelli, Esq., Assistant District Attorney, New York, NY, for Respondent.

## *OPINION*

CHIN, District Judge.

*Pro se* petitioner Jon–Adrian Velazquez petitions this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Following a jury trial in the Supreme Court of New York, New York County, petitioner was convicted on March 7, 2000 of one count of Murder in the Second Degree (New York Penal Law ("P.L.") § 125.23(3)), one count of Attempted Murder in the Second Degree (P.L. §§ 110.00/125.25(1)), three counts of Robbery in the First Degree (P.L. § 160.15(2)), and one count of Attempted Robbery in the First Degree (P.L. §§ 110.00/160.15(2)). He was sentenced to concurrent indeterminate terms of imprisonment of twenty-five years to life on the murder count, twelve and a half to twenty-five years each on the attempted murder and robbery counts, and seven and a half to fifteen years on the attempted robbery count.

Petitioner contests his conviction on two grounds: (1) insufficiency of evidence, and (2) improper admission of evidence. The Court has reviewed the parties' submissions and the record of the proceedings below. For the reasons that follow, the petition is denied.

## *BACKGROUND*

### I. *The Facts*

The following is a summary of the facts adduced during the trial.

## A. *The Robbery and the Murder*

Around noon on January 27, 1998, a man—determined by the jury to be petitioner—walked into a Manhattan social club and asked Robert "Ricky" Jones, one of the club's employees, if he could play a number in the afternoon horse races. (Tr. 467–70, 472, 644–45). Petitioner was later described by witnesses as a "light-skinned Puerto Rican" man, approximately 5'7" tall, with "fresh braids." (Tr. 468, 501, 571–73, 644–45). Jones had a short conversation with petitioner as he took the bet. (Tr. 385, 469, 472). Petitioner left approximately four to five minutes after entering the club. (Tr. 433, 492).

Shortly after 1:00 p.m., petitioner returned to the club and asked to place another bet, but Jones informed him that all bets were closed. (Tr. 466, 478–80, 737). Petitioner asked if he could wait in the club for the outcome of the number. (Tr. 480). A few minutes later, as the doorbell rang, petitioner pulled a gun on one of the patrons in the club and ordered him to open the door. (Tr. 480–81, 737–38). Derry Daniels then entered the club and told everyone to get on the floor. (Tr. 389, 423–24, 481, 740, 744). Daniels proceeded to bind everyone's wrists and ankles with duct tape, as petitioner demanded money and jewelry from several of the hostages. (Tr. 200, 390, 404, 424, 483, 740, 957).

Approximately ten minutes into the robbery, Al Ward, the club's owner, pulled out his gun, snuck over to Daniels, and threatened to shoot Daniels if he did not get on the ground. (Tr. 200, 485–88, 741). After some confusion, Daniels informed petitioner that Ward had a gun. (Tr. 201, 403, 489–90, 741, 746–47). Petitioner reached over and shot Ward in the face, killing him. (Tr. 201, 403, 489–90, 741, 746–47). Daniels ran out of the club and petitioner slowly backed out the door. (Tr. 201, 320, 322, 490, 577, 742, 777–79, 783, 960). In total, the robbery-homicide took approximately 15 to 20 minutes. (Tr. 206, 493).

## B. *Witness Descriptions*

Over the course of the next few days, multiple witnesses to the robbery-homicide described the two robbers to police. (Tr. 344, 500, 798, 807, 1037, 1042, 1063–64). Specifically, each of the witnesses described the gunman as a light-skinned Puerto Rican or black man, with braided hair, between 5'6" or 5'10" tall, and approximately 150 to 160 pounds, with a thin moustache, and wearing a "knit" hat. (Tr. 344–47, 356, 359–60, 368, 500–01, 571, 605–06, 620–21, 807–09, 1042–44, 1063–64). The witnesses also described the other robber as darker-skinned than the gunman, clean shaven, and with a strong build. (Tr. 213, 297, 368–69, 374, 481–82, 498, 574–75, 607–08, 738, 803).

## C. *The Photo Identifications*

On January 27, 1998, Jones reviewed photographs of "light-skinned Puerto Ricans" at the police station. (Tr. 501–02, 610–11, 625–26). In response to being asked whether he was sure the gunman was Puerto Rican, Jones said that he "might" have been "black, light-skinned," but that the gunman looked Puerto Rican to him. (Tr. 501–02, 610–11, 625–26). After being shown photos of "light-skinned" black men, Jones selected a photo he believed resembled the gunman, but Jones noted that he was "much lighter skinned" than the man in the photograph. (Tr. 611–13, 625–26, 652–55). Jones rated the sketch composed by the police artist as a "six out of ten" for accuracy. (Tr. 503–04, 613–14).

On January 30, 2004, Augustus Brown, another witness present during the shooting, reviewed photographs of Hispanic men. (Tr. 1143). After reviewing over

800 photographs, Brown identified petitioner as the gunman. (Tr. 1143, 1221–23, 1239–40). Detective LiTrenta continued to have Brown review photographs, but Brown maintained that petitioner was the gunman. (Tr. 1221–23, 1239–40).

#### D. *The Line-ups*

On February 2, 1998, after his mother informed him that officers were looking for him, petitioner went to the 28th precinct with his attorney. (Tr. 905). Detective LiTrenta assembled a line-up with five persons similar in appearance to petitioner. (Tr. 904–05, 1089–90). Petitioner's attorney objected to three fillers, who Detective LiTrenta replaced. (Tr. 1089–90). After petitioner's attorney was satisfied with the line-up, the petitioner chose the second spot in the line-up. (Tr. 911). Each person in the line-up was given a knit hat so that their hairstyles were not revealed. (Tr. 1091).

One-by-one, the witnesses present at the robbery-homicide viewed the line-up in the presence of petitioner's attorney. (Tr. 208, 391–92, 494, 754, 907–08, 969–70, 1158, 1161). Ricky Jones, Phillip Jones, and Augustus Brown immediately identified petitioner as the gunman. (Tr. 210–11, 494–95, 755, 913, 1161). Red Woodford initially stated he could not positively identify petitioner as the gunman. (Tr. 969). Shortly after the line-up, however, he explained to Detective LiTrenta that although he recognized petitioner as the gunman, he thought police had enough evidence without his testimony and was scared to run into petitioner on the street. (Tr. 969–71, 975–76). Dorothy Canaday stated that petitioner looked like the gunman. (Tr. 392–93). As a result of the identifications, Detective LiTrenta arrested petitioner. (Tr. 1092).

## II. *Procedural History*

### A. *The Indictment*

On February 11, 1998, a grand jury in the Supreme Court, New York County, charged petitioner with committing murder in the first and second degree, attempted murder in the second degree, robbery in the first degree, criminal use of a firearm in the first degree, and burglary in the second degree.

### B. *The Trial*

On October 14, 1999, the jury trial commenced before Justice Jeffrey Atlas. The prosecution presented the testimony of seven eyewitnesses to the robbery-homicide: Ricky Jones, Phillip Jones, Augustus Brown, Red Woodford, Dorothy Canaday, Matty Alex, Joseph Scott, along with the testimony of ten New York City police officers and detectives, two crime scene unit detectives, and the doctor who performed the autopsy on Al Ward. At trial, Brown, Ricky Jones, Philip Jones, and Red Woodford identified petitioner as the gunman. (Tr. 201–02, 219, 493, 739, 812, 956, 1054). Canaday incorrectly identified one of the jurors as the gunman. (Tr. 394). Petitioner, Vanessa "Iris" Cepero (his girlfriend), and Maria Velasquez (his mother) were defense witnesses.

On direct, Cepero testified that she could verify petitioner's whereabouts on the day of the robbery-homicide. Specifically, Cepero told the jury that on the day of the murder, she saw petitioner speak to his mother about arrangements to visit his father's grave, and was in the apartment for several hours thereafter. (Tr. 1335–38, 1353–54). Petitioner used Cepero's testimony to establish his alibi that he could not possibly have been at the scene of the crime because he was home with her.

In response to Cepero's testimony, two New York City police detectives who ini-

tially interviewed Cepero took the stand. Both testified that Cepero had told them a different story when she was first interviewed. (Tr. 1555, 1572–74). In direct contradiction to Cepero's trial testimony, they stated that Cepero had previously told them that she had been asleep from 8:00 a.m. to 1:30 p.m., and thus could not account for where petitioner was during the murder. (Tr. 1555, 1572–74).

The jury returned a guilty verdict on March 7, 2000 on one count of Murder, one count of Attempted Murder in the Second Degree, three counts of Robbery in the First Degree, and one count of Attempted Robbery in the First Degree.

### D. *The Appeals*

Petitioner filed a timely notice of appeal to the Appellate Division, First Department. His appeal presented the following claims: (1) the evidence presented at trial was insufficient to prove petitioner's guilt beyond a reasonable doubt, and (2) the trial court erred in permitting the People to improperly introduce collateral alibi rebuttal evidence. On December 16, 2004, the First Department unanimously affirmed petitioner's conviction. *People v. Velazquez*, 13 A.D.3d 184, 785 N.Y.S.2d 914 (1st Dep't 2004). The court ruled that the verdict was "based on legally sufficient evidence and was not against the weight of the evidence." *Id.* (*citing People v. Bleakley*, 69 N.Y.2d 490, 515 N.Y.S.2d 761, 508 N.E.2d 672 (1987)). Additionally, the court found that the jury properly credited the four eyewitnesses' "highly reliable identifications" over the "defendant's alibi defense." *Id.* The court also held that the rebuttal evidence that the trial court admitted was "not collateral, but was closely connected to the alibi testimony." *Id.*

The Court of Appeals denied petitioner's application for leave to appeal on April 6, 2005. *People v. Velazquez*, 4 N.Y.3d 857, 797 N.Y.S.2d 431, 830 N.E.2d 330 (2005).

### E. *The Instant Petition*

Velasquez's habeas petition, dated June 28, 2006, was received by this Court's *Pro Se* office on July 11, 2006.

### *DISCUSSION*

### I. *Federal Review of State Convictions*

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") "placed a new restriction on the power of the federal courts to grant writs of habeas corpus to state prisoners." *Williams v. Taylor*, 529 U.S. 362, 399, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). AEDPA sets forth new standards of review that make it more difficult for a habeas petitioner to obtain federal relief from a state conviction. It provides that:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to any judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits unless the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved in an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1), (2).

"[C]learly established Federal law in § 2254(d)(1) refers to the holdings, as opposed to the dicta," of Supreme Court decisions as of the time of the relevant state-court decision. *Carey v. Musladin*, — U.S. ——, ——, 127 S.Ct. 649, 653, 166 L.Ed.2d 482 (2006) (*quoting Williams*, 529

U.S. at 412, 120 S.Ct. 1495) (internal quotations omitted). Moreover, AEDPA has been interpreted to require a petitioner to show not only that clearly established federal law was erroneously or incorrectly applied, but that the application was unreasonable. *See Williams,* 529 U.S. at 411, 120 S.Ct. 1495; *see also Lockyer v. Andrade,* 538 U.S. 63, 66, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003); *Bell v. Cone,* 535 U.S. 685, 688, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002). As the Second Circuit has explained, "[a] state court decision is 'contrary to' Supreme Court precedent only if it either 'arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law' or 'confronts facts that are materially indistinguishable from a relevant Supreme Court precedent' and arrives at [the opposite result]." *Lainfiesta v. Artuz,* 253 F.3d 151, 155 (2d Cir.2001) (*quoting Williams,* 529 U.S. at 405, 120 S.Ct. 1495). The standards set forth by AEDPA apply to all habeas petitions filed after the state's effective date of April 24, 1996. *See Boyette v. Lefevre,* 246 F.3d 76, 88 (2d Cir.2001) (*citing Williams,* 529 U.S. at 402, 120 S.Ct. 1495).

AEDPA also specifies the applicable standard for federal review of state court factual findings: a petitioner must demonstrate that a decision was "based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(2). In habeas proceedings, a "determination for a factual issue made by a state court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). The petitioner has the burden of rebutting this presumption "by clear and convincing evidence." *Id.*

## II. *The Merits*

Petitioner raises two grounds for federal habeas relief: (1) insufficient evidence to support his conviction, and (2) improper admission of rebuttal evidence.

## A. *Insufficiency of Evidence*

### 1. *Applicable Law*

■ An insufficiency of the evidence claim will be denied if "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of a crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Moreover, "the findings in the state court are presumptively correct and entitled to a high degree of deference as that court was in the best position to view the credibility of the witnesses and all of the facts as they were adduced [at trial]." *Santos v. Zon,* 206 F.Supp.2d 585, 589 (S.D.N.Y.2002) (*quoting Smithwick v. Walker,* 758 F.Supp. 178, 184 (S.D.N.Y.1991)). Accordingly, a petitioner challenging a decision based on sufficiency of the evidence "bears a very heavy burden." *Diaz v. Greiner,* 110 F.Supp.2d 225, 233 (S.D.N.Y.2000) (*quoting United States v. Rivalta,* 892 F.2d 223, 227 (2d Cir.1989)).

Because the state court's findings are presumptively correct, a federal habeas court does not weigh the evidence or determine the credibility of the witnesses. Instead, the jurors are responsible for assessing a witness's credibility after evaluating any inconsistencies in her testimony. *Means v. Barkley,* No. 98 Civ. 7603(DLC), 2000 WL 5020, at *4 (S.D.N.Y. Jan. 4, 2000). Thus, an "eyewitness's testimony is unbelievable as a matter of law only if 'no reasonable juror could believe [her].' " *Bonilla v. Portuondo,* No. 00 Civ. 2369(JGK), 2004 WL 1782174, at *3–4 (S.D.N.Y. Aug.9, 2004) (*quoting United States v. Rodriguez,* 702 F.2d 38, 41–43 (2d Cir.1983)). Courts have found that an eyewitness's testimony is sufficient even when

the witness's descriptions are inconsistent. *Id.* (eyewitness testimony sufficient for a conviction even where the witness failed to mention the assailant's mustache or other facial details). Such issues are left for the jury to resolve and are "precisely the type[s] of factual determination[s] and credibility evaluation[s] that the Supreme Court has precluded in reviewing habeas corpus petitions." *Means,* 2000 WL 5020, at *4 (*quoting Banks v. People,* No. 94 Civ. 555(DLC), 1994 WL 661100, at *2 (S.D.N.Y. Nov.22, 1994)).

### 2. *Application*

█ The issue at hand is whether the People presented sufficient evidence to establish that petitioner was the gunman who shot and killed Al Ward and robbed the club on January 27, 1998. I conclude that, based on the evidence presented at trial, a rational juror could have found beyond a reasonable doubt that petitioner was the person who shot and killed Ward and robbed the club.

The testimony of the four eyewitnesses[1] firmly establishes that they had ample opportunity to examine the gunman's features during the robbery and to confirm his identity afterwards. Specifically, the witnesses: (1) observed the robber who killed Ward several times throughout the course of the 15–minute robbery, and (2) identified petitioner twice—once the week of the robbery and a second time while testifying in court. For example, during trial, Ricky Jones testified that he had an initial conversation with petitioner an hour prior to the robbery and assisted him in placing a bet. (Tr. 469–74). Additionally, during the robbery, Phillip Jones was less than two feet from petitioner, and Brown and Woodford were less than an arm's

length from petitioner as he pointed a gun at them. (Tr. 199–201, 291, 294–95, 308, 758–59, 955–57, 965). Each of these four witnesses then later independently identified petitioner during a line-up approved by petitioner's attorney. (Tr. 208–11, 494–98, 755, 913, 969, 1161). All four witnesses recognized petitioner in the line-up despite the fact that he had shaved off his mustache and goatee, two key features they had used in describing him to officers prior to the line-up. (Tr. 208–11, 494–98, 755, 913, 969, 1161). Finally, nothing about the circumstances of the eyewitnesses' identification of petitioner renders their testimony unreasonable or unbelievable.

While petitioner asks the Court to place greater weight on his own witnesses' testimony, his evidence, and specifically his alibi, the Court's function is not to weigh the evidence. *Means,* 2000 WL 5020, at *4. Although petitioner questions the credibility of the People's witnesses, specifically Brown and Canaday, the jury viewed all the evidence at trial and heard the testimony of all the witnesses, and thus was in the best position to make credibility determinations. Specifically, the jury was able to determine whether there was enough corroborative evidence to convict petitioner and reject his alibi. *See United States v. Morrison,* 153 F.3d 34, 49 (2d Cir.1998) (holding that jury was entitled to make credibility determinations of defendant and his witnesses and "conclude that the testimony was fabricated, so that the opposite was true"). Additionally, as the Appellate Division found, "there was no basis for disturbing the jury's determinations concerning identification and credibility" because "four eyewitnesses made highly reliable identifications."[2] *Velazquez,* 13 A.D.3d at 185, 785 N.Y.S.2d 914.

---

1. Ricky and Phillip Jones, Augustus Brown, and Red Woodford.

2. Despite Canaday's misidentification of petitioner during trial, the jury clearly found that the remaining eyewitness identifications and

Although petitioner alleges that the testimony of the four eyewitnesses who identified him during the trial did not match the descriptions they initially provided to police officers during the investigation, the evidence indicates otherwise. Each of the eyewitnesses, including Ricky Jones, Philip Jones, Red Woodford, and Augustus Brown, both during the investigation and at trial, described petitioner as a "light-skinned Puerto Rican," or possibly a black man with a light complexion, with braided hair and thin sideburns, a beard and moustache, about 5′6″ to 5′10″ tall, and approximately 150 pounds, in his 20s, and wearing a "knit" hat or hoodie. (Tr. 344–47, 359–62, 368, 500–02, 573, 603–07, 617–23, 634–36, 789–99, 802, 807–09, 882, 1033–38, 1042–44, 1063–64, 1223–25).

Petitioner also argues that his actual appearance did not match the description of the gunman initially provided by the witnesses: a black male with braided hair. First, despite petitioner's argument that he is not black and thus was misidentified by the witnesses, the jury was able to observe him during the trial and determine for themselves whether he could have been mistaken for a black man. Similarly, petitioner's argument that he could not have had braids the day of the robbery is unpersuasive. The only evidence petitioner submitted in support of this claim was a photograph of himself. Petitioner and his girlfriend testified the photograph was taken in January 1998, and thus it would have been impossible for him to have braids. (Tr. 1340, 1506). Although petitioner has short, cropped hair in the photograph, there is no printed date on the photograph itself and thus it could have been taken at any point. Indeed, as the People mention in their brief, petitioner's photographic evidence might have served as a double-edged sword, confirming many testimony were strong enough to convict petitioner.

of the gunman's features described by the witnesses, including being "light-skinned" and having a thin moustache and sideburns.

Accordingly, I conclude that the jury's verdict was based on sufficient evidence and its finding that petitioner was the gunman during the January 27 robbery was reasonable.

## B. *Improper Admission of Evidence*

### 1. *Applicable Law*

To demonstrate that the admission of evidence by a state trial court is improper and constitutes grounds for federal habeas relief, a petitioner must: (1) prove that the state court's decision "violated a state evidentiary rule, because the proper application of a presumptively constitutional state evidentiary rule could not be unconstitutional"; (2) assert that the "state evidentiary error violated an identifiable constitutional right"; and (3) show that the error "deprived [him] of a *fundamentally fair* trial." *Roman v. Filion*, No. 04 Civ. 8022(KMW), 2005 WL 1383167, at *26 (S.D.N.Y. Jun. 10, 2005)(*quoting Rosario v. Kuhlman*, 839 F.2d 918, 925 (2d Cir. 1988)).

For an "erroneous admission of . . . unfairly prejudicial evidence to amount to a denial of due process, the item must have been 'sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it.' " *Dunnigan v. Keane*, 137 F.3d 117, 125 (2d Cir.1998) (*quoting Johnson v. Ross*, 955 F.2d 178, 181 (2d Cir.1992)). In assessing materiality, the court must view the evidence "objectively in light of the entire record before the jury," *Collins v. Scully*, 755 F.2d 16, 19 (2d Cir.1985), and determine whether the al-

leged "prejudicial evidence is 'probative of [an] essential element' in the case." *Dunnigan,* 137 F.3d at 125 (*quoting Estelle v. McGuire,* 502 U.S. 62, 69, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991)).

 Under New York law, a "party has the right to impeach or discredit the testimony of an opponent, and such evidence is always competent. He may contradict the testimony of a witness as to any matters upon which he has been called to give evidence in chief, provided it is not collateral to the issue." *People v. Harris,* 57 N.Y.2d 335, 345, 456 N.Y.S.2d 694, 442 N.E.2d 1205 (1982), *cert. denied,* 460 U.S. 1047, 103 S.Ct. 1448, 75 L.Ed.2d 803 (1983). Evidence is not collateral when it is relevant to some issue other than general credibility, and specifically, where it "is offered for the purpose of disproving facts set forth by a witness for the opposing side on direct examination." *People v. Beavers,* 127 A.D.2d 138, 141, 514 N.Y.S.2d 235 (1st Dep't 1987); *see People v. Wise,* 46 N.Y.2d 321, 328, 413 N.Y.S.2d 334, 385 N.E.2d 1262 (1978). Moreover, evidence is always material where it is relevant to the very issues that the jury must decide. *Wise,* 46 N.Y.2d at 328, 413 N.Y.S.2d 334, 385 N.E.2d 1262. New York courts have consistently found that a challenge to the validity of an alibi defense is a material issue, and thus extrinsic rebuttal evidence is permitted. *People v. Knight,* 80 N.Y.2d 845, 847, 587 N.Y.S.2d 588, 600 N.E.2d 219 (1992); *People v. Cade,* 73 N.Y.2d 904, 905, 539 N.Y.S.2d 287, 536 N.E.2d 616 (1989); *People v. Patterson,* 194 A.D.2d 570, 572, 598 N.Y.S.2d 328 (2d Dep't 1993). Ultimately, the decision whether to permit the introduction of evidence is entrusted to the sound discretion of the trial court and appellate courts should not disturb a trial court's ruling absent a clear abuse of that discretion. *See* CPL § 260.30(7); *Harris,*

57 N.Y.2d at 345, 456 N.Y.S.2d 694, 442 N.E.2d 1205.

### 2. Application

 The issue presented by petitioner's second claim is whether the trial court clearly abused its discretion by permitting two New York City police detectives to testify in response to the alibi witness. I hold that the testimony by the detectives was properly admitted because the testimony went directly to issues being determined by the jury and was not merely used to impeach Cepero's credibility on wholly collateral matters.

The testimony of the detectives went to the heart of the "very issue the jury had to decide," *i.e.,* whether petitioner was present at the robbery-homicide. *Wise,* 46 N.Y.2d at 328, 413 N.Y.S.2d 334, 385 N.E.2d 1262. If Cepero had been sleeping when the robbery occurred, as she had previously told detectives, then she could not account for petitioner's whereabouts at the time of the robbery-homicide. Thus, the validity of petitioner's alibi defense was a material issue that could be countered by rebuttal evidence. *Knight,* 80 N.Y.2d at 847, 587 N.Y.S.2d 588, 600 N.E.2d 219; *Cade,* 73 N.Y.2d at 905, 539 N.Y.S.2d 287, 536 N.E.2d 616. "The fact that the evidence also tends to impeach the witness' credibility does not render the evidence collateral." *Patterson,* 194 A.D.2d at 571–72, 598 N.Y.S.2d 328 (affirming admissibility of rebuttal evidence because testimony challenged the validity of facts testified to by the alibi witness).

Additionally, petitioner argues that the admission of the rebuttal evidence was not harmless error because it was significant to the jury's determination to reject the alibi defense. The decision to admit the evidence, however, was not error at all. Moreover, the jury was presented with

substantial additional evidence: reliable identifications by four eyewitnesses.

Thus, the trial court did not abuse its discretion in permitting the rebuttal evidence.

### CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is denied. Because petitioner has not made a substantial showing of the denial of a constitutional right, I decline to issue a certificate of appealability. *See* 28 U.S.C. § 2254 (as amended by AEDPA). I certify pursuant to 28 U.S.C. § 1915(a)(3) that any appeal taken from this decision would not be in good faith. The Clerk of the Court is directed to enter judgment accordingly and to close this case.

SO ORDERED.